# Exhibit 4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

ROUTE HOLDING INC. and                          :
BEAM COMPANY INC.,
                                                :
            Plaintiffs,
                                                :       06 Civ. 3428
    - against -
                                                :       ECF CASE
INTERNATIONAL OIL OVERSEAS INC.,
a.k.a. IOOI, and                                :
MARINA WORLD SHIPPING CORP.,
                                                :
            Defendants.
-----------------------------------------------------------------X

## DECLARATION OF HARA ANASTASATOU
## IN SUPPORT OF PLAINTIFF'S OPPOSITION TO
## MOTION TO VACATE MARITIME ATTACHMENT

Hara Anastasatou declares under penalty of perjury of the laws of the United States of America as follows:

1.      I am a claims administrator with the company Marmaras Navigation Ltd. and I make this Declaration in Support of Plaintiffs' Opposition to Defendant, Marina World Shipping's ("MWS") Motion to Vacate the Attachment.

2.      Marmaras Navigation Ltd. was at all material times the commercial and technical manager of the M/T DELTA SAILOR on behalf of Plaintiff Route Holding Inc. ("RHI") and of the M/T PELAGOS on behalf of Plaintiff Beam Company Inc. ("BCI").

3.      I work with Mr. Martin Glibbery, manger of the legal and insurance department of Marmaras Navigation Ltd. regarding Plaintiffs' claims against IOOI and MWS. I make this declaration based upon my own personal knowledge and upon documents that I believe to be true and accurate.

4.      Plaintiff RHI was at all material times the Owner of the motor tanker "DELTA SAILOR." Defendant, International Oil Overseas Inc. ("IOOI") was at all material times the charterer of the M/T DELTA SAILOR.

5.      By a charter party dated April 25, 2005, Plaintiff RHI chartered the M/T DELTA SAILOR to IOOI. *See RHI Charter Party annexed hereto as Exhibit "1."*

6.      IOOI was the only charterer named in the charter party contract.

7.      Certain disputes arose between RHI and IOOI during the course of the charter party contract regarding IOOI's failure to pay demurrage due and owing to RHI under the charter party.

8.      As a result of IOOI's breach of the charter party contract, RHI has suffered, and will continue to suffer, losses in the total principal sum of $11,395.31, as best can now be estimated, exclusive of interest, reasonable attorneys fees and arbitration costs.

9.      Pursuant to clause K and clause 24 of the charter party, all disputes arising thereunder are to be submitted to arbitration in London with English law to apply.

·10.      Despite due demand, IOOI failed to pay the demurrage due and owing under the charter party. As a result, RHI has commenced arbitration and appointed an arbitrator.

11.      Plaintiff BCI was at all material times the Owner of the motor tanker "PELAGOS."

12.      By a charter party dated May 28, 2005, BCI chartered the M/T PELAGOS to IOOI. *See BCI Charter Party annexed hereto as Exhibit "2."*

13.      IOOI was at all material times the only charterer of the M/T PELAGOS.

14.    Certain disputes arose between the BCI and IOOI during the course of the charter party contract regarding IOOI's failure to pay demurrage, bunker costs and other expenses/damages due and owing to BCI under the charter party.

15.    As a result of IOOI's breach of the charter party contract, BCI has suffered, and will continue to suffer, losses in the total principal sum of $306,531.00, as best can now be estimated, exclusive of interest, attorneys' fees, and arbitration costs.

16.    Pursuant to clause K and clause 24 of the charter party, all disputes arising thereunder are to be submitted to arbitration in London with English law to apply

17.    Despite due demand, IOOI failed to pay the amounts due and owing under the charter party. As a result, BCI has commenced arbitration and appointed an arbitrator.

18.    In support of MWS' Motion to Vacate, Mohammed Hani Abdul Kader Al Bakri of MWS has filed with this Court his Declaration dated July 18, 2006 wherein he affirms that: MWS has no affiliation with IOOI and the two companies enjoy an arms-length business relationship. *See Declaration of Hani Bakri*, ¶¶ *5-6*. For the reasons that follow, and based upon even a cursory review of the attached exhibits, it is evident that MWS and IOOI are alter egos of each other and Mr. Bakri's declaration is, at best, a gross misrepresentation of the facts.

19.    In order to present the evidence in the clearest way possible this declaration is split into two parts, which have some overlapping elements. The first part of the declaration sets forth facts and evidence which demonstrate that IOOI is merely a shell corporation through which MWS conducts business. The second part of the declaration sets forth facts and evidence which demonstrate that both IOOI and MWS are two of several companies that are managed, operated and controlled as a single economic entity, known as the BAKRI GROUP, headed up by none other than Mr. Bakri himself.

## IOOI IS MERELY A SHELL CORPORATION
## THROUGH WHICH MWS CONDUCTS BUSINESS

20.     Contrary to Mr. Bakri's statements, it is not a sound commercial practice in the maritime industry to have another company habitually pay one's debts.  Making such payments on a systematic basis would be especially unusual without there being some formal relationship, i.e. owner/manager, between them.

21.     On May 6, 2005, an entity named "Marina World Shipping" made a payment on behalf of IOOI in regards to the DELTA SAILOR charter party.  This entity had no relationship to the underlying charter party, and IOOI was the only entity liable for the freight payment.  *See Message from IOOI confirming payment and Remittance Details annexed hereto as Exhibit "3."*

22.     No one from either IOOI or MWS informed us of any "assignment."

23.     When we brought Plaintiffs' claims to Tisdale & Lennon, LLC, we became aware of another attachment case involving the same parties, IOOI and MWS.  An agreement to cooperate with the plaintiff in the other case against IOOI and MWS was forged on May 4, 2006, before the instant action was initiated.

24.     From that other case, we learned that MWS had a history of making payments on behalf of IOOI.  Furthermore, it was revealed that IOOI referred to and treated MWS' bank account as its own.  When IOOI stated that payments would be coming from its account, the payment was always remitted under the name "Marina World Shipping."  Finally, it was discovered that MWS made payments on behalf of IOOI in areas where IOOI should have exclusive control.  The events summarized herein are described below.

25.     On February 22, 1998, IOOI sent a letter to a ship owner named "Garda Shipping" stating that it (IOOI) would make a payment regarding the charter of the M/V

SHIBUMI. Particularly, IOOI stated that "we have arranged remittance of USD 390,000 to Owners nominated banks account being freight through Riyad Bank Main, Branch, Jeddah with value date 24/02/98." IOOI further stated, "we instructed our bank to send direct TLX to your confirming remittance." The letter is signed "IOOI/JEDDAH." *See Letter from IOOI annexed hereto as Exhibit "4."*

26.    However, when the payment came through on February 24, 1998, the name on the remittance did not state IOOI, but instead, "Marina World Shipping." *See Bank Remittance details confirming that Marina World Shipping paid IOOI's debt to the Plaintiff annexed hereto as Exhibit "5."*

27.    MWS made freight payments on IOOI's behalf once again when it paid the freight due under another charter party of the M/T "SHIBUMI" dated November 12, 1998. *See Freight Remittance Details regarding charter party dated November 12, 1998 annexed hereto as Exhibit "6."*

28.    As with the previous charter, IOOI sent a letter confirming that it (IOOI) would have its banks pay the owners. However, when the payment came through the name on the remittance details was not IOOI, but "Marina World Shipping." *See Letter from IOOI regarding payment for November 12th charter annexed hereto as Exhibit "7."*

29.    The information provided by the other plaintiff seeking to attach IOOI and MWS revealed that MWS does not only make payments on behalf of IOOI in regards to the monies due under charter parties. On the contrary, MWS also acts and makes payments for IOOI in areas where IOOI should have exclusive control.

30.    On March 13, 2001, MWS made a series of four payments to Waterson Hicks for arbitration costs assessed against IOOI even though Marina World Shipping was not a party to

the arbitration. *See copies of Bank Remittance advices concerning payment of the "SHIBUMI" Arbitration Award Costs into Waterson Hicks Account annexed hereto as Exhibit "8."*

31.    Upon information and belief, neither Waterson Hicks nor the plaintiff involved therein were informed about any assignment between IOOI and MWS.

32.    Many other links between IOOI and MWS were exposed after the Order of Maritime Attachment and Garnishment was issued on May 4, 2006.

33.    In addition to the four instances listed above, there are at least seven other occasions where MWS paid IOOI's debts without apparent explanation or excuse. And, these are only the payments I know of.

34.    IOOI was the only charterer named in the charter parties for all seven of the payments. The payments are described below.

35.    MWS made a freight payment on IOOI's behalf in regards to the M/T PELAGOS charter on July 12, 2005. *See Message from IOOI confirming payment and Bank Remittance Details annexed hereto as Exhibits "9."*

36.    MWS also paid IOOI's debts in regards to the charter of the PRIGIPOS on August 24, 2004. *See Bank Remittance Details annexed hereto as Exhibit "10."*

37.    Furthermore, MWS made three payments on IOOI's behalf in regards to the NORD SEA charter on May 24, 2004, September 15, 2004 and January 18, 2005 respectively. *See Exhibits "11," "12," and "13."*

38.    In addition, on December 21, 2005, MWS made a payment on behalf of IOOI for the settlement of various demurrage claims in which IOOI was the only party liable in the corresponding charter parties. As done previously, IOOI confirmed that it would pay against a copy of the invoice. *See Message from IOOI, Invoice to IOOI and Wire Remittance details*

*annexed hereto as Exhibit "14."* However, when the payment came through, the name listed on the wire remittance was "Marina World Shipping."

39.    To our knowledge, IOOI has never made a payment on its own behalf. All payments received by the Plaintiffs in regards to their respective charters with IOOI came from MWS.

40.    MWS itself stated that it made yet another freight payment on IOOI's behalf on May 9, 2006. *See Bakri Declaration, ¶19.*

41.    It was discovered after the attachment action, that IOOI frequently withholds the payment of demurrage owed under its charters in order to negotiate a discount. This policy was revealed to us in a conversation with one of IOOI's representatives.

42.    As further evidence of the IOOI-MWS alter ego relationship is the fact that MWS and IOOI have the same address.

43.    Although Mr. Bakri claims that MWS and IOOI have separate leases, this is of no moment, as the *entire building* appears to owned and operated by a group of companies named the "BAKRI GROUP" which controls both IOOI and MWS as if they were one, single economic entity.

## IOOI AND MWS ARE DOMINATED AND CONTROLLED AS A SINGLE ECONOMIC ENTITY KNOWN AS THE BAKRI GROUP

44.    On May 15, 2006, we received a copy of the MRC investigation report on the "BAKRI GROUP" and "IOOI." This report details the companies working within the BAKRI GROUP and sets forth facts which link IOOI thereto. *See MRC Report annexed hereto as Exhibit "15."*

45.    Based on the MRC report and other information available, it is evident that IOOI and MWS are two of several companies which are operated, controlled and managed as a single economic enterprise known as the "BAKRI GROUP."

46.    The relationship between the BAKRI GROUP, IOOI, and MWS is made clear by an examination of the directors appointed on IOOI's and MWS' boards.

47.    We had investigative search performed regarding the directors of both IOOI and the MWS.

48.    The directors of MWS include Mr. Bakri and his immediate family members, who serve in many other positions within the BAKRI GROUP.

49.    In addition, two of the directors of IOOI are tied to the BAKRI GROUP.  The directors of IOOI are listed as Abdel Kader Mohamed El Amin, M. Othman Mahamd, and Saber Abu Ammara.

50.    Abdel Kader Mohamed El Amin works as the administrative officer of Ocean Marine Services, Fujairah.  Ocean Marine is believed to be a Bakri controlled ship agency to handle vessels taking bunkers from International Supply Co., Kari's Fujairah based bunker operation.

51.    It should be noted that Ocean Marine's PO Box has occasionally popped up as an alternative address for IOOI.  *See Exhibit "15."*

52.    In addition, the director, Saber Abu Ammara, is a Jordanian who works in the legal department of Bakri Navigation.

53.    We have no doubt that the third director of IOOI, M. Othman Mahamad, is also connected to Bakri Navigation and the Bakri Group as a whole.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on July 25, 2006.

Hara Anastasatou

## AFFIRMATION OF SERVICE

I hereby certify that on July 25, 2006, a copy of the foregoing DECLARATION OF HARA ANASTASATOU IN SUPPORT OF PLAINTIFFS' OPPOSITION TO MOTION TO VACATE MARITIME ATTACHMENT was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's CM/ECF system.

By:_____/s/_____
Nancy R. Peterson

EXHIBIT 1

Association of Ship Brokers
& Agents (U.S.A.), Inc.

October 1977

**1ST ORIGINAL**

CODE WORD FOR THIS
CHARTER PARTY:

**ASBATANKVOY**

# TANKER VOYAGE CHARTER PARTY

PREAMBLE

SINGAPORE          25 APRIL 05
Place                    Date

IT IS THIS DAY AGREED between *ROUTH HOLDING INC*

chartered owner/owner (hereinafter called the "Owner") of the *MARSHALL ISLANDS.*

*SS/MS M/T DELTA SAILOR*                                    (hereinafter called the "Vessel")

and *INTERNATIONAL OIL OVERSEAS INC.*                        (hereinafter called the "Charterer")

that the transportation herein provided for will be performed subject to the terms and conditions of this Charter Party, which includes this Preamble and Part I and Part II. In the event of a conflict, the provisions of Part I will prevail over those contained in Part II.

PART I

A.  Description and Position of Vessel:

Deadweight: *111003.6*          tons (2240 lbs.)  Classed: *LLOYD'S REGISTER*

Loaded draft of Vessel on assigned summer freeboard *14.618 M ft.*          in. in salt water.

Capacity for cargo: *123785.2 CU.M EX SLOP TANK* tons (of 2240 lbs. each)  *98*          % more or less, Vessel's option.

Coated:          [X] Yes    [ ] No

Coiled:          [X] Yes    [ ] No          Last two cargoes: *NA*

Now: *FUEL OIL/DIRTY PETROLEUM PRODUCTS EXCL VGO, CBFS AND LSWR* Expected Ready:

B.  Laydays:

Commencing: *25.04.05*          Cancelling: *27.04.05*

C.  Loading Port(s):    *1 SP UAE NOT NORTH OF BUT INCLUDING RUWAIS*

~~Charterer's Option~~

D.  Discharging Port(s):    *1 SP FUJAIRAH*

~~Charterer's Option~~

E.  Cargo:  *MAXIMUM TWO(2) GRADES WITHIN VESSEL'S NATURAL SEGREGATION FUEL OIL/DIRTY PETROLEUM PRODUCTS  EXCL  VGO,  CBFS  AND  LSWR.  VESSEL  TO  MAINTAIN  LOADED  TEMPERATURE  BUT  MAXIMUM  135 DEGREES FAHRENHEIT. MAXIMUM LOADED TEMPERATURE 160 DEGREES FAHRENHEIT.*

~~Charterer's Option~~

per ton (of 2240 lbs. each).

F.  Freight Rate:  *LUMPSUM USD 290,000*

G.  Freight Payable to:
*HSBC BANK PLC*
*93, AKTI MIAOULI STR., P.O.BOX 80461*
*185 38 PIRAEUS – GREECE*

*SWIFT : MIDLGRAA*
*IBAN NO   : GR05 0710 0010 0000 0105 0855 071*

*ACC. NO   : 001-050855-071*
*BENEFICIARY: TROUTE-HOLDING INC.*

**1ST ORIGINAL**

*CORRESPONDING BANK FOR USD:*
*HSBC BANK USA - 140, BROADWAY - NEW YORK 10015*
*ABA: 021001088 - CHIPS NO: 0108*
*ACCT NO:000-04779-1 SWIFT: MRMDUS33*
of

H.   Total Laytime in Running Hours: *84 HOURS TOTAL WSTC*

I.   Demurrage per day; *$27,500 FDPR*

J.   Commission of *5*   % is payable by Owner to *OF WHICH 2.5 ADDCOM AND 1.25 PCT TO CAPITAL LONDON AND 1.25 PCT TO RS PLATOU ASIA FRT/DEMM.*

        on the actual amount freight, when and as freight is paid.

K.   The place of General Average and arbitration proceedings to be London/New York (strike out one).

~~L.   Tovalop: Owner warrants Vessel to be a member of TOVALOP scheme and will be so maintained throughout duration of this charter.~~

M.   Special Provisions:

- *CONOCO WEATHER TO APPLY*

- *BIMCO ISPS CLAUSE TO APPLY*

- *MAX 3 HRS WAITING FOR CARGO DOCS FOR OWNERS ACCT.*

- *ANY/ALL TAXES A/O DUES ON CARGO A/O FREIGHT TO BE FOR CHARTERERS'*
*ACCOUNT AND TO BE PAID DIRECTLY BY THEM*

*MASTER TO DISCHARGE ANY CARGO FROM THE VESSEL ONLY UPON RECEIVING CHARTERERS WRITTEN*
*AUTHORIZATION AS PER FORM BELOW:*
++++ ++++ +++++

*To : Master .... And or Warehouse ....*

*"We confirm that you are hereby authorized to berth and discharge*
*approximately...... mts of ...... as per the charter party terms and conditions*
*and any subsequent delivery instructions dated subsequent to this message. "*

        IN WITNESS WHEREOF, the parties have caused this Charter, consisting of a Preamble, Parts I and II, to be executed in duplicate

as of the day and year first above written.

Witness the signature of:

> **B  FOR A&I GENERALE OF**
> **MARMARA STEAMOWNERS LTD.**
> **By:**
> **PIRAEUS**
>
> **AS NON - RESPONSIBLE AGENTS ONLY**

Witness the Signature of:

                                                                By:

This Contempany is a computer generated copy of ASBATANKVOY form, printed under licence from the Association of Ship Brokers & Agents (U.S.A.) Inc., using software which is the copyright of Strategic Software Limited. It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original character, or the insertion of new characters, such characters being clearly highlighted as having been made by the licensor and/or act by the author.

**PART II**          **1ST ORIGINAL**

1. **WARRANTY - VOYAGE - CARGO.** The Vessel, classed as specified in Part I hereof, and to be so maintained during the currency of this Charter, shall, with all convenient dispatch, proceed as ordered to Loading Port(s) named in accordance with Clause 4 hereof, or so near thereunto as she may safely get (always afloat), and being so loaded shall proceed, as ordered by the Charterer, on signing Bills of Lading, direct to the Discharging Port(s), or so near thereunto as she may safely get (always afloat), and deliver said cargo. If heating of the cargo is requested by the Charterer, the Owner shall exercise due diligence to maintain the temperatures requested.

2. **FREIGHT.** Freight shall be at the rate stipulated in Part I and shall be computed on intake quantity (except deadfreight as per Clause 3) as shown on the Inspector's Certificate of Inspection. Payment of freight shall be made by Charterer without discount upon delivery of cargo at destination, less any disbursements or advances made to the Master or Owner's agents at ports of loading and/or discharge and cost of insurance thereon. No deduction of freight shall be made for water and/or sediment contained in the cargo. The services of the Petroleum Inspector shall be arranged and paid for by the Charterer who shall furnish the Owner with a copy of the Inspector's Certificate.

3. **DEADFREIGHT.** Should the Charterer fail to supply a full cargo, the Vessel may, at the Master's option, and shall, upon request of the Charterer, proceed on her voyage, provided that the tanks in which cargo is loaded are sufficiently filled to put her in seaworthy condition. In that event, however, deadfreight shall be paid at the rate specified in Part I hereof on the difference between the intake quantity and the quantity the Vessel would have carried if loaded to her minimum permissible freeboard for the voyage.

4. **NAMING LOADING AND DISCHARGING PORTS.**

(a) The Charterer shall name the loading port or ports at least twenty-four (24) hours prior to the Vessel's readiness to sail from the last previous port of discharge, or from bunkering port for the voyage, or upon signing this Charter if the Vessel has already sailed. However, Charterer shall have the option of ordering the Vessel to the following destinations for wireless orders:

On a voyage to a port or ports let

| | |
|---|---|
| ST. KITTS | Carlbean or U.S. Gulf loading port(s) |
| PORT SAID | Eastern Mediterranean or Persian Gulf loading port(s) |
| | (from port west of Port Said,) |

(b) If lawful and consistent with Part I and with the Bills of Lading, the Charterer shall have the option of nominating a discharging port or ports by radio to the Master on or before the Vessel's arrival at or off the following places:

| Place | On a voyage to a port or ports for |
|---|---|
| LAND'S END | United Kingdom/Continent (Bordeaux/Hamburg range) |
| | or Scandinavia (including Denmark) |
| SUEZ | Mediterranean (from Persian Gulf) |
| GIBRALTAR | Mediterranean (from Western Hemisphere) |

(c) Any extra expense incurred in connection with any change in loading or discharging ports (as named) shall be paid for by the Charterer and any time thereby lost to the Vessel shall count as used laytime paid at demurrage rate.

5. **LAYDAYS.** Laytime shall not commence before the date stipulated in Part I, except with the Charterer's sanction. Should the Vessel not be ready to load by 4:66 12.00 o'clock P. M. (local time) on the cancelling date stipulated in Part I, the Charterer shall have the option of cancelling this Charter by giving Owner notice of such cancellation within twenty-four (24) hours after such cancellation date; otherwise this Charter is to remain in full force and effect.

6. **NOTICE OF READINESS.** Upon arrival at customary anchorage at each port of loading or discharge, the Master or his agent shall give the Charterer or his agent notice by letter, telegraph, wireless or telephone that the Vessel is ready to load or discharge cargo, berth or no berth, and laytime, as hereinafter provided, shall commence upon the expiration of six (6) hours after receipt of such notice, or upon the Vessel's arrival in berth (i.e., finished mooring when at a loading or discharging terminal and all fast when loading or discharging alongside a vessel), whichever first occurs. However, where delay is caused to Vessel getting into berth after giving notice of readiness for any reason over which Charterer has no control, such delay shall not count as used laytime.

7. **HOURS FOR LOADING AND DISCHARGING.** The number of running hours specified as laytime in Part I shall be permitted the Charterer as laytime for loading and discharging cargo; but any delay due to the Vessel's condition or breakdown or inability of the Vessel's facilities to load or discharge cargo within the time allowed shall not count as used laytime. If regulations of the Owner or port authorities prohibit loading or discharging of the cargo at night, time so lost shall not count as used laytime. If the Charterer, shipper or consignee prohibits loading or discharging at night, time so lost shall count as used laytime. Time consumed by the vessel in moving from loading or discharge port anchorage to her loading or discharge berth, discharging ballast water or slops, unless concurrently with cargo operations will not count as used laytime.

8. **DEMURRAGE.** Charterer shall pay demurrage per running hour and pro rata for a part thereof at the rate specified in Part I for all time that loading and discharging and used laytime as elsewhere herein provided exceeds the allowed laytime elsewhere herein specified. If, however, demurrage shall be incurred at ports of loading and/or discharge by reason of fire, explosion, storm or by a strike, lockout, stoppage or restraint of labor or by breakdown of machinery or equipment in or about the plant of the Charterer, supplier, shipper or consignee of the cargo, the rate of demurrage shall be reduced one-half of the amount stated in Part I per running hour or pro rata for any part thereof for demurrage so incurred. The Charterer shall not be liable for any demurrage for delay caused by strike, lockout, stoppage or restraint of labor for Master, officers and crew of the Vessel or tugboat or lighters.

9. **SAFE BERTHING - SHIFTING.** The vessel shall load and discharge at any safe place or wharf, or alongside vessels or lighters reachable on her arrival, which shall be designated and procured by the Charterer, provided the Vessel can proceed thereto, lie at, and depart therefrom always safely afloat, any lighterage being at the expense, risk and peril of the Charterer. The Charterer shall have the right of shifting the Vessel at ports of loading and/or discharge from one berth to another on payment of all towage and pilotage shifting to such berth, charges for running lines on and off and wharf age, additional agency charges and expenses, customs overtime and fees, and any other extra port charges or port expenses incurred by reason of using more than one berth. Time consumed on account of shifting shall count as used laytime except as otherwise provided in Clause 15.

10. **PUMPING IN AND OUT.** The cargo shall be pumped into the Vessel at the expense, risk and peril of the Charterer, and shall be pumped out of the Vessel at the expense of the Vessel, but at the risk and peril of the Vessel only so far as the Vessel's permanent hose connections, where delivery of the cargo shall be taken by the Charterer or its consignee. If required by Charterer, Vessel after discharging is to clear away from her lines of cargo by pumping water through them and time consumed for this purpose shall apply against allowed laytime. The Vessel shall supply her pumps and the necessary power for discharging in all ports, as well as necessary hands. However, should the Vessel be prevented from supplying such power by reason of regulations prohibiting fires on board, the Charterer or consignee shall supply, at its expense, all power necessary for discharging as well as loading, but the Owner shall pay for power supplied to the Vessel for other purposes. If cargo is heated from lighters, the Vessel shall furnish steam at Charterer's expense for pumping cargo into its vessel, if requested by the Charterer, providing the Vessel has facilities for generating steam and is permitted to have fires on board. All overtime of officers and crew incurred in loading and/or discharging shall be for account of the Vessel.

11. **HOSES: MOORING AT SEA TERMINALS.** Hoses for loading and discharging shall be furnished by the Charterer and shall be connected and disconnected by the Charterer, or, at the option of the Owner, by the Owner at the Charterer's risk and expense. Laytime shall continue until the hoses have been disconnected. *If vessel is delayed by more than 3 hours awaiting documents, laytime or demurrage, if vessel is on demurrage, shall count until documents are onboard.* When Vessel loads or discharges at a sea terminal, the Vessel shall be properly equipped at Owner's expense for loading or discharging at such place, including suitable ground tackle, mooring lines and equipment for handling submarine hoses.

12. **DUES - TAXES - WHARFAGE.** The Charterer shall pay all taxes, dues and other charges on the cargo, including but not limited to Customs overtime on the cargo, Venezuelan Habilitation Tax, C.I.M. Taxes at La Havre and Portuguese Imposto de Comercio Maritima. The Charterer shall also pay all taxes on freight at loading or discharge ports and any unusual taxes, assessments and governmental charges which are not presently in effect but which may be imposed in the future on the Vessel or freight. The Owner shall pay all dues and other charges on the Vessel (whether or not such dues or charges are assessed on the basis of quantity of cargo), including but not limited to French droits de quai and Spanish derramas taxes. The Vessel shall be free of charges for the use of any wharf, dock, place or mooring facility arranged by the Charterer for the purpose of loading or discharging cargo; however, the Owner shall be responsible for charges for such berth when used solely by the Vessel's purposes, such as awaiting Owner's orders, tank cleaning, repairs, etc. before, during or after loading or discharging.

13. (a) **CARGOES EXCLUDED VAPOR PRESSURE.** Cargo shall not be shipped which has a vapor pressure at one hundred degrees Fahrenheit (100 deg. F.) in excess of thirteen and one-half pounds (13.5 lbs.) as determined by the current A.S.T.M. Method (Reid) D-323-58.

(b) **FLASH POINT.** Cargo having a flash point under one hundred and fifteen degrees Fahrenheit (115 deg F.) (closed cup) A.S.T.M. Method D-56 shall not be loaded from lighters but this clause shall not entitle the Charterer from loading or topping off Crude Oil from vessels or barges inside or outside the bar at any port or place where bar conditions exist.

14. (a) **ICE.** In case port of loading or discharge should be inaccessible owing to ice, the Vessel shall direct her course according to Master's judgment, notifying by telegraph or radio, if available, the Charterer, shipper or consignee, who is bound to telegraph or radio orders for another port, which is free from ice and where there are facilities for the loading or reception of the cargo in bulk. The whole of the time occupied from the time the Vessel is directed by reason of the ice until her arrival at an ice-free port of loading or discharge, as the case may be, shall be paid for by the Charterer at the demurrage rate stipulated in Part I.

(b) If on account of ice the Master considers it dangerous to enter or remain at any loading or discharging place for fear of the Vessel being frozen in or damaged, the Master shall communicate by telegraph or radio, if available, with the Charterer, shipper or consignee of the cargo, who shall telegraph or radio him in reply, giving orders to proceed to another port as per

**1ST ORIGINAL**

Clause 14 (b) where there is no danger of ice and where then are the necessary facilities for the loading or unloading of the cargo the Vessel is to remain at the original port at their risk, and in either case Charterers to pay for the time that the Vessel may be delayed, at the demurrage rate stipulated in Part I.

15.   TWO OR MORE PORTS COUNTING AS ONE. To the extent that the freight rate standard of reference specified in Part I F hereof provides for special groupings or combinations of ports or terminals, any two or more ports or terminals within such each grouping or combination shall count as one port for purposes of calculating freight and demurrage only, subject to the following conditions:

   (a)   Charterer shall pay freight at the highest rate payable under Part I F hereof for a voyage between the loading and discharge ports used by Charterer.

   (b)   All charges normally incurred by reason of using more than one port for each of the Charterer's account as provided in Clause 9 hereof.

   (c)   Time consumed shifting between the ports or terminals within the particular grouping or combination shall not count as used laytime.

   (d)   Time consumed shifting between berths within one of the ports or terminals of the particular grouping or combination shall count as used laytime.

16.   GENERAL CARGO. The Charterer shall not be permitted to ship any packaged goods or non-liquid bulk cargo of any description; the cargo the Vessel is to load under this Charter is to consist only of liquid bulk cargo as specified in Clause I.

17.   (a)   QUARANTINE. Should the Charterer send the Vessel to any port or place where a quarantine exists, any delay thereby caused to the Vessel shall count as used laytime; but should the quarantine not be declared until the Vessel is on passage to such a port, the Charterer shall not be liable for any resulting delay.

   (b)   FUMIGATION. If the Vessel, prior to or after entering upon this Charter, has docked or docks at any wharf which is not rat-free or rat-proof, she shall, before proceeding to a rat-free or rat-proof wharf, be fumigated by the Owner at his expense, except that if the Charterer ordered the Vessel to an infected wharf the Charterer shall bear the expense of fumigation.

18.   CLEANING. The Owner shall clean the tanks, pipes and pumps of the Vessel to the satisfaction of the Charterer's own independent inspector. The Vessel shall not be responsible for any admixture if more than one quality of oil is shipped, nor for leakage, contamination or deterioration in quality of the cargo unless the admixture, leakage, contamination or deterioration results from (a) unseaworthiness existing at the time of loading or at the inception of the voyage which was discoverable by the exercise of due diligence, or (b) error or fault of the servants of the Owner in the loading, care or discharge of the cargo.

19.   GENERAL EXCEPTIONS CLAUSE. The Vessel, her Master and Owner shall not, unless otherwise in this Charter expressly provided, be responsible for any loss or damage, or delay or failure in performing hereunder, arising or resulting from:—any act, neglect, default or barratry of the Master, pilots, mariners or other servants of the Owner in the navigation or management of the Vessel; fire, unless caused by the personal design or neglect of the Owner; collision, stranding or peril, danger or accident of the sea or other navigable waters; saving or attempting to save life or property; wastage in weight or bulk, or any other loss or damage arising from inherent defect, quality or vice of the cargo; any act or omission of the Charterer or Owner, shipper or consignee of the cargo, their agents or representatives; insufficiency of packing; insufficiency or inadequacy of marks; explosion, bursting of boilers, breakage of shafts, or any latent defect in hull, equipment or machinery; unseaworthiness of the Vessel unless caused by want of due diligence on the part of the Owner to make the Vessel seaworthy or to have her properly manned, equipped and supplied; or from any other cause of whatsoever kind arising without the actual fault or privity of the Owner. And neither the Vessel nor Master or owner, nor the Charterer, shall, unless otherwise in this Charter expressly provided, be responsible for any loss of damage or delay or failure in performing hereunder, arising or resulting from:—Act of God; act of war; perils of the seas and of public enemies; pirates or assailing thieves; arrest or restraint of princes, rulers or people; or actions taken under legal process provided bond is promptly furnished to release the Vessel or cargo seized or detained; or stoppage or restraint of labor from whatever cause, either partial or general; or riot or civil commotion.

20.   ISSUANCE AND TERMS OF BILLS OF LADING.

   (a)   The Master shall, upon request, sign Bills of Lading in the form appearing below for all cargo shipped but without prejudice to the rights of the Owner and Charterer under the terms of this Charter. The Master shall not be required to sign Bills of Lading for any port which, the Vessel cannot enter, remain at and leave in safety and always afloat nor for any blockaded port.

   (b)   The cargo of cargo under this Charter Party and under all Bills of Lading issued for the cargo shall be subject to the statutory provisions and other terms set forth or specified in sub-paragraphs (i) through (vii) of this clause and such terms shall be incorporated verbatim or be deemed incorporated by the reference in any such Bill of Lading. In such sub-paragraphs and in any Act referred to therein, the word "carrier" shall include the Owner and the Chartered Owner of the Vessel.

   (i)   CLAUSE PARAMOUNT. This Bill of Lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April 16, 1936, except that if this Bill of Lading is issued at a place where any other Act, ordinance or legislation gives statutory effect to the International Convention for the Unification of Certain Rules relating to Bills of Lading at Brussels, August 1924, then this Bill of Lading shall have effect, subject to the provisions of such Act, ordinance or legislation. The applicable Act, ordinance or legislation (hereinafter called the "Act") shall be deemed to be incorporated herein and nothing herein contained shall be deemed a surrender by the Owner of any of its rights or immunities or an increase of any of its responsibilities or liabilities under the Act, and if any term of this Bill of Lading be repugnant to the Act to any extent, such term shall be void to that extent but no further.

   (ii)   JASON CLAUSE. In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Owner is not responsible, by statute, contract or otherwise, the cargo shippers, consignees or owners of the cargo shall contribute with the Owner in General Average in the payment of any sacrifices, losses or expenses of a General Average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo. If a salving ship is owned or operated by the Owner, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the Owner or his agents may deem sufficient to cover the estimated contribution of the cargo and any salvage and special charges thereon shall, if required, be made by the cargo, shippers, consignees or owners of the cargo to the carrier before delivery.

   (iii)   GENERAL AVERAGE. General Average shall be adjusted, stated and settled according to York-Antwerp Rules 1950 and, in matters not provided for by these rules, according to the laws and usages at the port of New York or at the port of London, whichever place is specified in Part I of this Charter. If a General Average statement is required, it shall be prepared at such port or place in the United States or United Kingdom, whichever country is specified in Part I of this Charter, as may be selected by the Owner, unless otherwise mutually agreed, by an Adjuster appointed by the Owner and approved by the Charterer. Such Adjuster shall attend to the settlement and the collection of the General Average, subject to customary charges. General Average Agreements and/or security shall be furnished by Owner and/or Charterer, and/or Owner and/or Consignee of cargo, if required. Any cash deposit being made as security by any General Average interest shall be remitted to a duly authorized and licensed bank at the place where the General Average statement is prepared.

   (iv)   BOTH TO BLAME. If the Vessel comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, mariner, pilot or the servants of the Owner in the navigation or in the management of the Vessel, the owners of the cargo carried hereunder shall indemnify the Owner against all loss or liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said cargo, paid or payable by the other or non-carrying ship or her owners to the owners of said cargo and set-off, recouped or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying ship or Owner. The foregoing provisions shall also apply where the owners, operators or persons in charge of any ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect of a collision or contact.

   (v)   LIMITATION OF LIABILITY. Any provision of this Charter to the contrary notwithstanding, the Owner shall have the benefit of all limitations of, and exemptions from, liability accorded to the owner or chartered owner of vessels by any statute or rule of law for the time being in force.

   (vi)   WAR RISKS.   (a)   If any port of loading or of discharge named in this Charter Party or to which the Vessel may properly be ordered pursuant to the terms of the Bills of Lading be blockaded, or

   (b)   If owing to any war, hostilities, warlike operations, civil war, civil commotion, revolutions or the operation of international law (i) entry to any such port of loading or of discharge or the loading or discharge of cargo at any such port be considered by the Master or Owners in his or their discretion dangerous or prohibited or (ii) it be considered by the Master or Owners in his or their discretion dangerous or impossible for the Vessel to reach any such port of loading or discharge — the Charterers shall have the right to order the cargo or such part of it as may be affected to be loaded or discharged at any other safe port of loading or of discharge within the range of loading or discharging ports respectively established under the provisions of the Charter Party (provided such other port is not blockaded or that entry thereto or loading or discharge of cargo thereat is not in the Master's or Owner's discretion dangerous or prohibited). If no such orders be received from the Charterers within 48 hours after they or their agents have received from the Owners a request for the nomination of a substitute port, the Owners shall then be at liberty to discharge the cargo at any safe port which they or the Master may in their or his discretion decide on (whether within the range of discharging ports established under the provisions of the Charter Party or not) and such discharge shall be deemed to be due fulfillment of the contract or contracts of affreightment in so far as cargo so discharged is concerned. In the event of the cargo being loaded or discharged at any such other port within the respective range of loading or discharging ports established under the provisions of the Charter Party, the Charter Party shall be read in respect of freight and all other conditions whatsoever as if the voyage performed were that originally designated. In the event, however, that the Vessel discharges the cargo at a port outside the range of discharging ports established under the provisions of the Charter Party, freight shall be paid as for the voyage originally designated and all extra expenses involved in reaching the actual port of discharge and/or discharging the cargo thereat shall be paid by the Charterers of Cargo Owners. In the latter event the Owners shall have a lien on the cargo for all such extra expenses.

   (c)   The Vessel shall have liberty to comply with any directions or recommendations as to departure, arrival, routes, ports of call, stoppages, destinations, zones, waters, delivery or in any otherwise whatsoever given by the government of the nation under whose flag the Vessel sails or any other government or local authority including any de facto government or local authority by any person or body acting or purporting to act as or with the authority of any such government or authority or by any committee or person having under the terms of the war risks insurance on the Vessel the right to give any such directions or recommendations. If by reason of or in compliance with any such directions or recommendations, anything is done or is not done such shall not be deemed a deviation.

   If by reason of or in compliance with any such direction or recommendation the Vessel does not proceed to the port or ports of discharge originally designated or to which she may have been ordered pursuant to the terms of the Bills of Lading, the Vessel may proceed to any safe port of discharge which the Master or Owners in his or their discretion may decide on and there discharge the cargo. Such discharge shall be deemed to be due fulfillment of the contract or contracts of affreightment and the Owners shall be entitled to freight as if discharge has been effected at the port or ports originally designated or to which she may have been ordered pursuant to the terms of the Bills of Lading. All extra expenses involved in reaching and discharging the cargo at any such other port of discharge shall be paid by the Charterers and/or Cargo Owners and the Owners shall have a lien on the cargo for freight and all such expenses.

   (vii)   DEVIATION CLAUSE. The Vessel shall have liberty to call at any ports in any order, to sail with or without pilots, to tow or to be towed, to go to the assistance of vessels in

## 1ST ORIGINAL

distress, to deviate for the purpose of saving life or property or of landing any ill or injured person on board, and to call for fuel at any port or ports in or out of the regular course of the voyage. Any salvage shall be for the sole benefit of the Owner.

21. LIEN. The Owner shall have an absolute lien on the cargo for all freight, deadfreight, demurrage and other, including attorney fees, of recovering the same, which lien shall continue after delivery of the cargo into the possession of the Charterer, or at the holders of any Bills of Lading covering the same; or of any storageman.

22. AGENTS. The Owner shall appoint Vessel's agents at all ports.

23. BREACE. Damages for breach of this Charter shall include all payable damages, and all costs of suit and attorney fees incurred in any action hereunder.

24. ARBITRATION. Any and all differences and disputes of whatsoever nature arising out of this Charter shall be put to arbitration in the City of New York or in the City of London whichever place is specified in Part I of this charter pursuant to the laws relating to arbitration there in force, before a board of three persons, consisting of one arbitrator to be appointed by the Owner, one by the Charterer, and one by the two so chosen. The decision of any two of the three on any point or points shall be final. Either party hereto may call for such arbitration by notice upon any officer of the other, whenever he may be found, of a written notice specifying the name and address of the arbitrator chosen by the first moving party and a brief description of the dispute or differences which such party desires to put to arbitration. If the other party shall not, by notice served upon an officer of the first moving party within twenty days of the service of such first notice, appoint its arbitrator to arbitrate the dispute or differences specified, then the first moving party shall have the right without further notice to appoint a second arbitrator, who shall be a disinterested person with precisely the same force and effect as if said second arbitrator had been appointed by the other party. In the event that the two arbitrators fail to appoint a third arbitrator within twenty days of the appointment of the second arbitrator, either arbitrator may apply to a Judge of any court of maritime jurisdiction in the city aforementioned for the appointment of a third arbitrator, and the appointment of such arbitrator by such Judge on such application shall have precisely the same force and effect as if such arbitrator had been appointed by the two arbitrators. Until such time as the arbitrators finally close the hearings either party shall have the right by written notice served on the arbitrators and on an officer of the other party to specify further disputes or differences under this Charter for hearing and determination. Awards made in pursuance to this clause may include costs, including a reasonable allowance for attorney's fees, and judgment may be entered upon any award made hereunder in any Court having jurisdiction in the premises.

25. SUBLET. Charterer shall have the right to sublet the Vessel. However, Charterer shall always remain responsible for the fulfilment of this Charter in all its terms and conditions.

26. OIL POLLUTION CLAUSE. Owner agrees to participate in Charterer's program covering all pollution avoidance. Such program prohibits discharge overboard of all oily water, oily ballast or oil in any form of a persistent nature, except under extreme circumstances whereby the safety of the vessel, cargo or life at sea would be imperiled.
Upon action being given to the Owner that Oil Pollution Avoidance controls are required, the Owner will instruct the Master to retain on board the vessel all oily residues from consolidated tank washings, dirty ballast, etc., in one compartment, after separation of all possible water has taken place. All water separated to be discharged overboard.
If the Charterer requires that demobilization shall be used for the separation of oilwater, such demobilizer shall be obtained by the Owner and paid for by Charterer.
The oil residues will be pumped ashore at the loading or discharging terminal, either as segregated oil, dirty ballast or co-mingled with cargo as it is possible for Charterers to arrange. If it is necessary to retain the residue on board co-mingled with or segregated from the cargo to be loaded, Charterer shall pay for any deadfreight so incurred.
The Charterer agrees to pay freight as per the terms of the Charter Party on any consolidated tank washings, dirty ballast, etc., retained on board under Charterer's instructions during the loaded portion of the voyage up to a maximum of 1% of the total deadweight of the vessel that could be legally carried for such voyage. Any extra expenses incurred by the vessel at loading or discharging port in pumping ashore oil residues shall be for Charterer's account, and extra time, if any, consumed for this operation shall count as used laytime.

## BILL OF LADING

Shipped in apparent good order and condition by                          Steamship/s/steamship
on board the                                                            is Master, at the post of
whereof

to be delivered at the port of
or so near thereto as the Vessel can safely get, always afloat, unto

or order on payment of freight as the rate of

This shipment is carried under and pursuant to the terms of the contract/charter dated  New York/London                                                        , at Charterer, and
between
all the terms whatsoever of the said contract/charter except the rate and payment of freight specified therein apply to and govern the rights of the parties concerned in this shipment.           Bills of Lading
In witness whereof the Master has signed
of this tenor and date, one of which being accomplished, the others will be void.

Dated at                                                                  this                    day of

                                                                                                      Master

This Charter Party is a computer generated copy of the ASBATANKVOY form, printed under licence from the Association of Ship Brokers & Agents (U.S.A.), Inc., using software which is the copyright of Strategic Software Limited.

It is a precise copy of the original document which may be modified, amended or added to only by striking out of original characters, or the insertion of new characters, such characters clearly highlighted by underlining or use of colour or use of a larger font and marked as having been made by the licensee or text user as appropriate and not by the author

## 1ST ORIGINAL

INTERNATIONAL OIL OVERSEAS INC
Additional Clauses for ASBATANKVOY
Dated: 07.06.2003

M.T. "DELTA SAILOR " CP DATED:25 APR 2005

The vessel is capable ~~of heating to and~~ maintaining cargo at **CARGO LOADED TEMP BUT MAX 135** degrees Fahrenheit prior to ~~discharge as per Charterers Instructions. Due allowance in time only is to be made for cargo heating for a voyage of less than three days.~~ The vessel is to present at loading port(s) fit for the carriage of **THE AGREED** cargo.

5) PUMPING:

Owners warrant that the vessel can maintain at vessels manifolds a **AN AVERAGE** pressure of ~~140-100~~ PSI and/or that a full cargo can be discharged within twenty four (24) hours **IN BOTH CASES EXCLUDING STRIPPING**, provided shore facilities permit. Owner warrants vessel can discharge two (2) grades simultaneously.

~~In ship to ship transfer operations, vessel warrants to achieve a discharge rate of up to 2,500 metric tons per hour. Vessel to have on board a sufficient range of reducers to allow connection to various hose line diameters and terminal cargo manifolds.~~

6) SHIP TO SHIP TRANSFER OPERATIONS:

~~If required by the Charterers the vessel shall load and/or discharge full or part cargo alongside other vessel(s) in port or at a safe anchorage.~~ **ALWAYS AS PER OCIMF RULES AND REGULATIONS** ~~Concurrent loading or discharging from both side for cargo with flash point over 60 degrees centigrade shall be acceptable by owners, any restriction for such will not count as laytime used.~~

Charterers are to provide suitable fenders/lines and hoses **ETC AS PER OCIMF RULES AND REGULATIONS** to safely effect such operations ~~and have the option to store same on board for the duration of Charter Party. Handling of such equipment on board the vessel shall be by owners' crew at Owners' cost.~~ All such equipment shall be removed from the vessel by Charterers upon completion of ~~Charter Party~~ **LOADING OR DISCHARGING** without delay.

Vessel's crew shall connect/disconnect cargo hoses, heave down/heave up fenders, take/throw connection lines, transfer to/transfer back cargo hoses and any other activities required for the completion and safe conduct of the ship to ship transfer operation for their account without any exclusion.

~~Owners warrant that the vessel is equipped with minimum 10 ten derricks port and starboard amidships to handle bunker lines/cargo hoses.~~

2

1ST ORIGINAL

INTERNATIONAL OIL OVERSEAS INC
Additional Clauses for ASBATANKVOY
Dated: 07.06.2003

M.T. "DELTA SAILOR " CP DATED:25 APR 2005

**CHARTERERS HAVE NO LIABILITY FOR HULL OR OTHER DAMAGE,
IF ANY, THAT MAY OCCUR DURING SUCH OPERATIONS**

All extra insurance for above ship to ship literage operations shall be for Owners' account and Charterers have no liability for hull or other damage, if any, that may occur during such operations. Owners warrant that the vessel is equipped and capable of safely carrying out all procedures as set out in the latest revised edition of the ICS/OCIMF Ship to Ship Transfer Guide.

Ship to Ship Transfer may include Charterers very large crude barge (VLCB) of about 34,500 tdw chartered to perform such operations.

7) SUPER CARGO:

Charterers have the option to place on board one supercargo ~~at any time~~ during **LOAD OR DISCHARGE OF** this Charter Party. Owner is to provide such supercargo with good accommodation with private bath and food at Captain's table at a cost of US$7.00 per day at Charterers' expense. Supercargo will be allowed access, to investigate, ullage and sample all cargo, slop, bunker, and ballast tanks, also any void spaces, ~~and access to any other parts of vessel that may relate to carriage of cargo as he may require~~. **SUPERCARGO WILL REMAIN ON BOARD ONLY DURING LOADING AND DISCHARGING OPERATIONS.** He shall also have the right to require selected valves on bunker and cargo systems to be sealed to preclude the possibility of cargo/product/bunker migration.

8) VESSEL DESCRIPTION:

Questionnaire'88 form duly completed before placing on subjects to form an integral part of this c/p.

9) PROTECTION & INDEMNITY INSURANCE:

Owner warrants that the vessel is a member of the .. NORTH OF ENGLAND........ P&I Club and also a member of the ITOPF and will remain throughout the charter period. Owner warrants that vessel holds a pollution cover of ~~US$ 500 million, and additional US$ 200 million~~ US$ 1 BILLION during full time of Charter Party. ~~Owners agreed to allow Charterers to have the benefit of Owners' P&I Insurance to the extent the Rules of that Association permits.~~ Owners to be responsible for all third party claims which fall under Owner's responsibility.

10) INSURED VALUE:

3

1ST ORIGINAL

INTERNATIONAL OIL OVERSEAS INC
Additional Clauses for ASBATANKVOY
Dated: 07.06.2005

M.T. "DELTA SAILOR " CP DATED:25 APR 2005

The vessel insured value is US$ . USD 15 MILLION TOTAL VALUE

11) COMMUNICATIONS:
The master is to allow Charterers supercargo the use of vessels communication equipment EXCEPT MOBILE AND SATELLITE PHONES. for reasonable operational purposes without charge.

Master shall transmit to charterers, on owners account, daily noon positions giving required information regarding vessels position, distance to go, average speed, Eta next port, cargo temperature maintained and any other information requested. Vessel shall maintain twenty four hours (24 Hrs) watch on VHF Channel 16/14.

12) TRADING HISTORY:
Owners guarantee TO THE BEST OF OWNERS KNOWLEDGE that the vessel is not boycotted by the Arab League and has never traded to Israel.

13) AGENCY:
Owners to appoint Charterers recommended agents at load and discharge ports PROVIED COMPETITIVE.

14) ACCESS:
The Master shall not allow any vessel or craft, other than those of port authorities or pilots, to secure alongside without the express authority of Charterers.

15) OVER AGE INSURANCE:
Any additional insurance payable on vessel and/or cargo due to vessel's age or class shall be for Owners' account.

16) QUANTITATIVE RESPONSIBILITY:
Although Charterers' surveyor may be monitoring any transfer operation, this does not relieve Master or Owners of responsibility for verifying the quantity involved in each oil movement nor for liability under the terms of this charter party for any oil losses.

17) BERTH OCCUPANCY:
Owners warrant vessel shall vacate the berth after completion of ballasting or within one and a half hours following completion of loading/discharging whichever is sooner. If ship not able to vacate berth after such time due to reasons attributed to ship, any extra berth occupancy charges by

4

**1ST ORIGINAL**

INTERNATIONAL OIL OVERSEAS INC
Additional Clauses for ASBATANKVOY
Dated: 07.09.2003

M.T. "DELTA SAILOR " CP DATED:25 APR 2005

terminal and port shall be for owners account, all time lost
for such occupancy shall not count as used laytime. **HOWEVER IF VSL IS
WAITING FOR CARGO DOCUMENTS THEN SUCH TIME AND EXTRA COSTS AS
ABOVE TO BE FOR CHARTERERS ACCOUNT.**

18) **CHARTER SIGNATURE:**
Owners acknowledge Charterers' payment procedures require one
original signed **BY OWNERS OR THEIR AGENTS** Charter Party.

19) **INTRANSIT LOSS:**
In addition to other guarantees herein provided with respect
to the quality and quantity of vessel's cargo, Owners shall
be accountable for product losses, ~~all volumes corrected to~~
~~60 degrees Fahrenheit and~~ **TOTAL CALCULATED VOLUMES** assessed by an
independent cargo
inspector, in excess of the following:

~~0.4~~ 0.3 percent for non-volatile products (Fuel Oil and crude
Oil), ~~0.2 percent for gas oil motor oil gasoline, jet fuel~~
~~and naphtha.~~

20) **BLENDING:**
**OWNERS NOT TO BE RESPONSIOBLE FOR THE FINAL PRODUCT
WHATSOEVER. CHRTS WILL PROVIDE OWNERS AS PER OWNERS P & I
CLUB WORDING. LOI WORDING AGAINST BLENDING AND/OR COMMINGELING
WITHOUTH BANK GUARANTEE** Charterers have the right to load on top of any
cargo
previously loaded by them, load into a tank containing an on
board quantity at bottom, comingle cargo, and blend cargo on
board by intertank cargo transfer.

21) **DEMURRAGE TIME BAR:**
Owners agree that Charterers shall be released from all
liability for payment of demurrage, unless a ~~telex invoice is~~
~~received within 30 days upon completion of discharge thereby~~
~~followed by the the~~ claim ~~to be~~ **IS** submitted to Charterers in
writing with ~~fully certified~~ original supporting documents,
such shall include but not be limited to original signed
notice of readiness submitted and accepted and duly signed
time sheets and statement of facts duly counter signed **IF POSSIBLE** by
shippers and receivers respectively and original pumping logs
duly counter signed by terminal representatives **IF POSSIBLE** within ~~60~~ 90
days of completion of discharge.

22) **ADHERENCE TO VOYAGE INSTRUCTIONS:**
Owners / master will comply with Charterers **PROVIDED IN ACCORDANCE WITH
THIS C/P** voyage instructions except where safety of life, the vessel or cargo is at
risk.

5

**1ST ORIGINAL**

INTERNATIONAL OIL OVERSEAS INC
Additional Clauses for ASBATANKVOY          M.T. "DELTA SAILOR" CP DATED:25 APR 2005
Dated: 07.06.2005

23) YORK/ANTWERP RULES:
York/Antwerp Rules, 1974, as amended 1990, apply to this
charter party.

24) AVERAGE/ARBITRATION:
General Average and Arbitration shall take place in London
and English Law applies to this charter party.

25) BILLS OF LADING:
In the event of a change in discharge port AND/OR CONSIGNEE named in Bills
Of Lading or if the DULY ENDORSED ORIGINAL Bills of Lading are not
available at
discharge port(s), the cargo is to be released by Owners
against a Letter of Indemnity signed by an authorized
signatory of Charterers in Owners' P&I Club wording without
bank guarantee or counter signature.

26) ROB'S:
In the event that any cargo remains on board upon completion
of discharge, Charterers shall have the right to ~~deduct from~~
~~freight CLAIM~~ an amount equal to the FOB port of loading value of
such cargo plus freight due with respect thereto. PROVIDED THE VOLUME OF
CARGO REMAIAINING ON BOARD IS PUMPABLE, LIQUID AND REACHABLE BY
VESSEL'S MEANS AS DETERMINED BY AND INDEPENDENT SURVEYOR.

27) WAR RISKS:
~~Any increase of hull and machinery war risk premia over and~~
~~above those in effect on the date of this Charter Party will~~
~~be for Charterers account, except for the first seven days,~~
~~which shall be for Owners account. Any premia or increases~~
~~thereto attributable to closure (i.e. blocking and trapping)~~
~~insurance shall be for Owners account.~~
~~Surcharges which are in effect on the date of this Charter~~
~~Party are for Owners account.~~

BP WAR RISK INSURANCE CLAUSE (AMENDED) -
OWNERS SHALL EFFECT WAR RISKS INSURANCE IN RESPECT OF THE
HULL AND MACHINERY OF THE VESSEL AND THEIR OTHER INTERESTS (INCL
BUT NOT LIMITED TO, LOSS OF EARNINGS AND DETENTION AND    THEIR
PROTECTION AND INDEMNITY RISKS), AND THE BASIC PREMIUMS AND/OR
CALLS THEREFORE SHALL   BE FOR OWNERS ACCOUNT. WAR RISKS
INSURANCE ADDITIONAL PREMIUMS IF ANY ARE FOR CHARTERERS ACCOUNT,
NET OF ALL DISCOUNTS OR REBATES RECEIVED BY OWNERS, AND PROVIDED
ALWAYS THAT CHARTERERS ARE GIVEN AN INDICATION OF THE EXPECTED
AMOUNT OF ADDITIONAL PREMIUM AS SOON AS POSSIBLE AFTER RECEIPT OF
CHARTERERS VOYAGE ORDERS.

6

**1ST ORIGINAL**

INTERNATIONAL OIL OVERSEAS INC
Additional Clauses for ASBATANKVOY
Dated: 07.08.2003

M.T. "DELTA SAILOR " CP DATED:25 APR 2005

THE BENEFIT OF DISCOUNTS OR REBATES ON ADDITIONAL PREMIUM RECEIVED BY OWNERS FROM THEIR WAR RISKS INSURERS, UNDERWRITERS OR BROKERS SHALL BE CREDITED TO CHARTERERS IN FULL. CHARTERERS SHALL REIMBURSE OWNERS ANY AMOUNTS DUE UNDER THIS CLAUSE UPON RECEIPT OF OWNERS' INVOICE TOGETHER WITH REASONABLE SUPPORTING DOCUMENTATION INCLUDING ALL ASSOCIATED DEBIT AND CREDIT NOTES (IF ANY). FOR THE AVOIDANCE OF DOUBT ANY 'BLOCKING AND TRAPPING', 'LOSS OF PROFIT', 'LOSS OF HIRE', 'LOSS OF FREIGHT' OR 'LOSS OF BUNKERS' INSURANCE TAKE OUT BY OWNERS IN RESPECT OF THE VESSEL, AND ANY ADDITIONAL PREMIUM RELATING THERETO ARISING FROM CHARTERERS TRADING OF THE VESSEL SHALL BE FOR OWNERS' ACCOUNT. CREW WAR BONUS TO BE FOR OWNERS ACCOUNT.

28) ITOPF:
     Owners/Operators to be a member of ITOPF and shall present
     C.L.C. Certificate covering the entire Charter Party period.
     This is required before payment is made by Charterers.

29) PRORATION:
     ~~Laytime and waiting time if any at load/discharge ports to be~~
     ~~pro rated amongst charterers/receivers according to respective~~
     ~~cargo quantity.~~

30) ~~Naming Load and Discharge ports~~
     ~~Clause 4 of Asbatankvoy c/p to be replaced with this clause.~~
     ~~Notwithstanding anything to the contrary in this charter~~
     ~~party and notwithstanding what loading and/or discharging~~
     ~~ports/ranges may have been nominated and bills of lading~~
     ~~issued, charterer shall have the right to change its~~
     ~~nomination of the loading and/or discharging ports/ranges.~~
     ~~Any extra time and expense incurred by owner in complying~~
     ~~with charterer's orders shall be for charterer's account.~~
     ~~Freight is based on the voyage actually performed. Charterer~~
     ~~shall have the right to make as many changes as it deems~~
     ~~necessary.~~

31) POSITION AND BALLAST SPEED:
     Owners warrants that the vessel's position at the time of
     fixture is ... and vessel's ballast speed will be
     ..... knots with an expected Eta basis 6-7 MAY AGW.... as ......

32) SPEED:
     ~~Vessel will perform the laden voyage at ...... knots upto~~
     ~~ws 5, weather and safe navigation permitting.~~
     VESSEL WILL PERFORM LADEN PASSAGE AT ABT 14.0 KNOTS WSNP

33) BALLASTING/SHIFTING:
     Deballasting UNLESS CONCURRENT WITH CARGO

7

INTERNATIONAL OIL OVERSEAS INC
Additional Clauses for ASBATANKVOY
Dated: 07.08.2003

**1ST ORIGINAL**
M.T. "DELTA SAILOR" CP DATED:25 APR 2005

INTERNATIONAL OIL OVERSEAS
ADDITIONAL CLAUSES - (ASBATANKVOY)
DATED 07.08.2003   (1-39)

1) PRIVACY:
All negotiations and every detail of this fixture are to be
kept strictly private and confidential.

2) DRUG AND ALCOHOL CLAUSE:
Owners warrant that they have a policy on Drug and Alcohol
Abuse ("Policy") applicable to the vessel which meets or
exceeds the standards in the Oil Companies' International
Marine Forum Guidelines for the Control of Drugs and Alcohol
on Board Ship ("OCIMF Guidelines"). Owners further
warrant that this Policy will remain in effect during the
term of this Charter, and that Owners shall exercise due
diligence to ensure that the Policy is complied with. For
the purposes of the Clause and the OCIMF Guidelines, alcohol
impairment shall be defined as a blood alcohol content of
40 mg/100 ml or greater; the appropriate seafarers to be
tested shall be all vessel officers and the drug/alcohol
testing and screening shall include random testing of the
officers with a frequency to ensure that each officer is
tested at least once a year.

Owners further warrant that a full declaration has been
passed on to Exxon/Exxon affiliate, which as above states
that vessel operates under a Drug and Alcohol Policy which
meets or exceeds the OCIMF Guidelines.

3) ETA CLAUSE:
Master to give Charterers ETA loading port immediately on
fixing and 7 days, 72/48/24/12 hours prior arrival IF TIME ALLOWS
at loading and discharge ports where time permits also ETA discharge
port on sailing from load port as well as any change in ETA
exceeding 6 hours in all cases. All Eta notices are essential
for demurrage purposes.

4) CARGO:
Charterers have the option of loading Crude Oil, Dirty
Petroleum Products, Gasoil and Marine Diesel Oil, maximum ...
grades, but where vessel loads one grade on top of another
for admixing purposes same to be treated as one grade.

Owners warrant vessel is able to segregate minimum two (2)
grades with double valve, line and pump segregation.
Owner warrants vessel able to load/discharge two (2)
grades simultaneously without contamination.

1

## 1ST ORIGINAL

INTERNATIONAL OIL OVERSEAS INC
Additional Clauses for ASBATANKVOY
Dated: 07.08.2003

M.T. "DELTA SAILOR" CP DATED:25 APR 2005

OPERATIONS and time proceeding to FIRST berth shall not count as
used laytime or time on demurrage, even if vessel on
demurrage.

34) DOCUMENTATION:
Owners warrant and undertake that all loading documents shall
be strictly private and confidential and shall not be handed
over to any party other than charterer or charterers
agent/representative OR PORT AUTHORITIES , only if instructed by charterers.
Such confidentiality shall include copies and/or quotes of such
documents to any party other than charterers.

Owners undertake to instruct master to strictly adhere to
above and not to release any information under whatsoever
circumstances neither in writing or in verbal unless
agreed/instructed in writing by the charterers.

35) Charterers' shall have the right to ask owners to reissue new
Bill of Lading, as per requirements of charterers, upon
delivery of the ALL OFF signed B/L's to the owner/owners-agent
A REPRESENTATIVE APPOINTED BY OWNERS or
master. Owners shall comply with such request PROVIDED THE CONTENTS
OF NEW BILLS OF LADING ARE CORRECT .

36) ~~In case the vessel calling port Sudan master of vessel should
obtain signature and stamp of receivers and agents/all
concerned on following documents prior calling from port
Sudan. NOR, ullage report before discharge, ship ullage
report after discharge, dry tank certificate, time-sheet and
LOP if any.~~

37) Owners warrant that, a Safety Management System (SMS) in
accordance with the ISM code is in operation both on shore
and on board the vessels. Onwers further warrant that during the
entire duration of c/p, owner (or the company as defined by the
ISM code) shall have a valid document of compliance and the
vessels shall have a safety management certificate, copies of
which will be supplied to charterers ON THEIR REQUEST .

38) This charter party shall be treated as an independent
contract and neither party shall have the right of off-
setting and/or claim any amounts due or not due from any
other charter parties or dealings of whatsoever nature,
whether or not same may be due or justified.

The owner warrants that the master and vessel will fully
comply with c/p and will not lien cargo or delay or suspend
operations due to any claim arising out of PREVIOUS c/p's/contracts
between owner and charterers and/or any charterers affiliates

8

## 1ST ORIGINAL

INTERNATIONAL OIL OVERSEAS INC
Additional Clauses for ASBATANKVOY                    M.T. "DELTA SAILOR " CP DATED:25 APR 2005
Dated: 07.06.2003

and/or any of charterers subsidiary companies.

## 39) DISCHARGE / RELOAD CLAUSE:

Charterers may order the vessel to discharge and/or back load a part or full cargo
at any nominated port within the loading/discharging ranges specified within part 1
and within the rotation of the ports previously nominated, provided that any cargo
loaded is of the description specified in part 1 and the Master in his reasonable
discretion determines that the cargo can be loaded, segregated and discharged
without risk of contamination by, or of any other cargo. Charterers shall pay in
respect of loading, carrying and discharging such cargo as follows:

a) All time used including deviation if any to be for charterers account. Deviation
   and other port and anchorage time used at demurrage rate plus all bunkers FO
   and MDO consumed irrespective of vessel being idle or steaming, plus port
   cost.

b) Any additional expenses, including port charges and all bunkers FO and MDO
   consumed, incurred.

c) If the vessel is fixed on a world scale rate in part 1 then freight shall always be
   paid for the whole voyage at the rate(s) specified in part 1 on the largest cargo
   quantity carried on any ocean leg.

9

**EXHIBIT 2**

Association of Ship Brokers
& Agents (U.S.A.), Inc.

October 1977

**1ST ORIGINAL**

CODE WORD FOR THIS
CHARTER PARTY:

ASBATANKVOY

# TANKER VOYAGE CHARTER PARTY

## PREAMBLE

SINGAPORE    28 TH MAY 2005
Place         Date

IT IS THIS DAY AGREED between *BEAM COMPANY INC*

chartered owner/owner (hereinafter called the "Owner") of the        (hereinafter called the "Vessel")

SS/MS   *MT PELAGOS*                                                  (hereinafter called the "Charterer")

and   *INTERNATIONAL OIL OVERSEAS INC.*

that the transportation herein provided for will be performed subject to the terms and conditions of this Charter Party, which includes this Preamble
and Part I and Part II. In the event of a conflict, the provisions of Part I will prevail over those contained in Part II.

## PART I

A.  Description and Position of Vessel:

Deadweight:  *111,776*  tons (2240 lbs.)   Classed:   *DNV*

Loaded draft of Vessel on assigned summer freeboard  *14.618 M ft.*   -in- in salt water.

Capacity for cargo: *123785.2 CUM EX SLOP TANK* tons (of 2240 lbs. each)  *98*    % more or less, Vessel's option.

Coated:   [X] Yes   [ ] No

Coiled:   [X] Yes   [ ] No          Last two cargoes:        *CRUDE*

Now:                               Expected Ready: *10TH JUNE 2005*

B.  Laydays:

Commencing:  *10 TH JUNE 2005*   Cancelling:   *11TH JUNE 2005*

C.  Loading Port(s):  *1/4 SP AG EXCLUDING IRAN/IRAQ BUT INCLUDING GULF OF OMAN,KUWAIT ALWAYS TO BE
FIRST LOAD PORT AND IN GEO ROTATION.*

~~Charterer's Option~~

D.  Discharging Port(s):   *1/3 SP/STS SPORE-JAPAN RANGE INCL MALAYASIA,INDO,THAILAND,PHILLIPINES
BUT EXCLUDING CHINESE RIVER PORTS AND NONOC ISLAND. CHARTERERS TO DECLARE DISCHARGE RANGE
PASSING COLOMBO SPORE/THAILAND OR INDO/SCHINA /PHILLIPINES*

~~Charterer's Option~~

E.  Cargo:   *MIN 80000 MT CHOPT UPTO FULL CARGO, MAXIMUM THREE(3) GRADES WITHIN VESSEL'S NATURAL
SEGREGATION FUEL OIL/DIRTY PETROLEUM PRODUCTS EXCL VGO, CBFS AND LSWR. VESSEL TO MAINTAIN
LOADED TEMPERATURE BUT MAXIMUM 135 DEGREES FAHRENHEIT. MAXIMUM LOADED TEMPERATURE 160
DEGREES FAHRENHEIT.*

~~Charterer's Option~~

~~-per ton (of 2240 lbs. each)~~

F.  Freight Rate:  *WS 170   OVERRAGE AT 50 PCT*

G.  Freight Payable to:
*HSBC BANK PLC*

**1ST ORIGINAL**

*93, AKTI MIAOULI STR., PIRAEUS - GREECE, SWIFT MIDLGRAA*
*FAVOUR: BEAM COMPANY INC, ACCOUNT NUMBER  001-025139-036,  IBAN GR63 0710 0010 0000 0102 5139 036*
*CORRESPONDING BANK:*
*HSBC BANK USA, ABA 021001088  CHIPS 0108*
*ACCOUNT 000-04779-1, SWIFT MRMDUS33 e*

H.   Total Laytime in Running Hours:  *84 HOURS TOTAL WSTC*

I.   Demurrage per day:    *$26,000 PDPR*

J.   Commission of *3.75* % is payable by Owner - *OF WHICH 2.5 ADDCOM AND 1.25 PCT TO RS PLATOU ASIA ON FRT/DRFT AND DEMM*

on the actual amount freight, when and as freight is paid.

K.   The place of General Average and arbitration proceedings to be London/New York (strike out one).

L.   ~~Tovalop: Owner warrants Vessel to be a member of TOVALOP scheme and will be so maintained throughout duration of this charter.~~

M.   Special Provisions:
*BIMCO ISPS CLAUSE TO APPLY*

*CONOCO WEATHER TO APPLY*

*MAX 3 HRS WAITING FOR CARGO DOCS FOR OWNERS ACCT.*

*ANY/ALL TAXES A/O DUES ON CARGO A/O FREIGHT TO BE FOR CHARTERERS' ACCOUNT AND TO BE PAID DIRECTLY BY THEM*

*"IF LIGHTERING/LIGHTENING/STS TRANSSHIPMENT TAKES PLACE AT/OFF ANY PORT/PLACE SEA TERMINAL OR IF DISCHARGING VIA SEALINE, ANY DELAYS DUE TO WEATHER AND/OR SEA CONDITIONS (INCLUDING FOG) TO COUNT IN FULL AS LAYTIME OR DEMURRAGE IF VESSEL IS ON DEMURRAGE, AND ANY UNBERTHING /REBERTHING EXPENSES/TIME DUE TO WEATHER CONDITIONS AT THE ABOVE MENTIONED PORTS/PLACES TO BE FOR CHTERS' ACCOUNT"*

*MASTER TO DISCHARGE ANY CARGO FROM THE VESSEL ONLY UPON RECEIVING CHARTERERS WRITTEN AUTHORIZATION AS PER FORM BELOW:*
*To : Master .... And or Warehouse ....*

*"We confirm that you are hereby authorized to berth and discharge approximately...... mts of ..... as per the charter party terms and conditions and any subsequent delivery instructions dated subsequent to this message. "*

*OWNERS CONFIRM VESSEL FULLY COMPLIES WITH THE FOLLOWING CONDITIONS AT KUWAIT*
*1.Maximum loaded displacement : 100,000 MT*
*2. Maximum sailing draft : 13. 72 M*
*3.Maximum height of manifold : 16. 0 M*
*4. Maximum LOA : 260 M*
*5 . Minimum parallel body length (PBL.) : 61.00 M*
*6. Inert gas system (IGS) (Operational and in use)*
*7. Maximum permitted berthing draft: 10.0 M (to apply for all berths in case of more, than one berth /port)*
*8. The vessel should not exceed 20 years of age.*
*9. Vessel should comply with International Safety Management. Code (ISM) and must have a valid Safety Management Certificate (SMC) - '*
*10.Vessel exceeding 75 KT deadweight must be fitted with 8 steel mooring wires at each end forward and AFT.*
*11 .Vessel must comply fully with the provisions of the International Ship and Port Facility SECURITY (ISPS) Code, and be in possession of a valid International Ship Security Cert (ISSC) -*

IN WITNESS WHEREOF, the parties have caused this Charter, consisting of a Preamble, Parts I and II, to be executed in duplicate

as of the day and year first above written.

Witness the signature of:

FOR & ON BEHALF OF
THE OWNERS

By:

MAR...AS NAVI...ON LTD.

AS NON - RESPONSIBLE AGENTS ONLY

**1ST ORIGINAL**

Witness the Signature of:

By:

This Charterparty is a computer generated copy of ASBATANKVOY form, printed under licence from the Association of Ship Brokers & Agents (U.S.A.), Inc., using software which is the copyright of Strategic Software Limited. It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the insertion of new characters, such characters being clearly highlighted as having been made by the licensee or end user as appropriate and not by the author.

# 1ST ORIGINAL

## PART II

1.   WARRANTY - VOYAGE - CARGO. The vessel, classed as specified in Part I hereof, and to be so maintained during the currency of this Charter, shall, with all convenient dispatch, proceed as ordered to Loading Port(s) named in accordance with Clause 4 hereof, or so near thereunto as she may safely get (always afloat), and being seaworthy, and having all pipes, pumps and heater coils in good working order, and being in every respect fitted for the voyage, so far as the foregoing conditions can be attained by the exercise of due diligence, perils of the sea and any other cause of whatsoever kind beyond the Owner's and/or Master's control excepted, shall load (always afloat), from the factors of the Charterer a full and complete cargo of petroleum and/or its products in bulk, not exceeding what she can reasonably stow and carry over and above her bunker fuel, consumable stores, boiler feed, culinary and drinking water, and complement and their effects (sufficient space to be left in the tanks to provide for the expansion of the cargo), and being so loaded shall forthwith proceed, as ordered on signing Bills of Lading, direct to the Discharging Port(s), or so near thereunto as she may safely get (always afloat), and deliver said cargo. If tanking of the cargo is requested by the Charterer, the Owner shall exercise due diligence to maintain the temperature requested.

2.   FREIGHT. Freight shall be at the rate stipulated in Part I and shall be computed on intake quantity (except deadfreight as per Clause 3) as shown on the Inspector's Certificate of Inspection. Payment of freight shall be made by Charterer without discount upon delivery of cargo at destination, less any disbursements or advances made to the Master or Owner's agents at ports of loading and/or discharge and cost of insurance thereon. No deduction of freight shall be made for water and/or sediment contained in the cargo. The services of the Petroleum Inspector shall be arranged and paid for by the Charterer who shall furnish the Owner with a copy of the Inspector's Certificate.

3.   DEADFREIGHT. Should the Charterer fail to supply a full cargo, the Vessel may, at the Master's option, and shall, upon request of the Charterer, proceed on her voyage, provided that the tanks in which cargo is loaded are sufficiently filled to put her in seaworthy condition. In that event, however, deadfreight shall be paid at the rate specified in Part I hereof on the difference between the intake quantity and the quantity the Vessel would have carried if loaded to her minimum permissible freeboard for the voyage.

4.   NAMING LOADING AND DISCHARGE PORTS.
   (a)   The Charterer shall name the loading port or ports at least twenty-four (24) hours prior to the Vessel's readiness to sail from the last previous port of discharge, or from bunkering port for the voyage, or upon signing this Charter if the Vessel has already sailed. However, Charterer shall have the option of ordering the Vessel to the following destinations for wireless orders:

   On a voyage to a port of orders:
   ST KITTS                    Caribbean or U.S. Gulf loading port(s)
   PORT SAID                   Eastern Mediterranean or Persian Gulf loading port(s)
                               (from ports west of Port Said.)

   (b)   If lawful and consistent with Part I and with the Bills of Lading, the Charterer shall have the option of nominating a discharging port or ports by radio to the Master on or before the Vessel's arrival at or off the following places:

   Place                       On a voyage to a port or ports in:
   LAND'S END                  United Kingdom/Continent (Bordeaux/Hamburg range)
                               or Scandinavia (including Denmark)
   SUEZ                        Mediterranean (from Persian Gulf)
   GIBRALTAR                   Mediterranean (from Western Hemisphere)

   (c)   Any extra expense incurred in connection with any change in loading or discharging ports (so named) shall be paid for by the Charterer and any time thereby lost to the Vessel shall count as used Laytime *paid at demurrage rate.*

5.   LAYDAYS. Laytime shall not commence before the date stipulated in Part I, except with the Charterer's sanction. Should the Vessel not be ready to load by 4:00 *12:00* o'clock P. M. (local time) on the cancelling date stipulated in Part I, the Charterer shall have the option of cancelling this Charter by giving Owner notice of such cancellation within twenty-four (24) hours after such cancellation date, otherwise this Charter to remain in full force and effect.

6.   NOTICE OF READINESS. Upon arrival at customary anchorage at each port of loading or discharge, the Master or his agent shall give the Charterer or his agent notice by letter, telegraph, wireless or telephone that the Vessel is ready to load or discharge cargo, berth or no berth, and laytime, as hereinafter provided, shall commence upon the expiration of six (6) hours after receipt of such notice, or upon the Vessel's arrival in berth (i.e., finished mooring when at a loading or discharging terminal and all fast when loading or discharging alongside a wharf), whichever first occurs. However, where delay is caused to Vessel getting into berth after giving notice of readiness for any reason over which Charterer has no control, such delay shall not count as used laytime.

7.   HOURS FOR LOADING AND DISCHARGING. The number of running hours specified as laytime in Part I shall be permitted the Charterer as laytime for loading and discharging cargo; but any delay due to the Vessel's condition or breakdown or inability of the Vessel's facilities to load or discharge cargo within the time allowed shall not count as used laytime. If regulations of the Owner or port authorities prohibit loading or discharging of the cargo at night, time so lost shall not count as used laytime; if the Charterer, shipper or consignee prohibits loading or discharging at night, time so lost shall count as used laytime. Time consumed by the vessel in moving from loading or discharge port anchorage to her loading or discharge berth, discharging ballast water or slops *unless carried out concurrently with cargo operations,* will not count as used laytime.

8.   DEMURRAGE. Charterer shall pay demurrage per running hour and pro rata for a part thereof at the rate specified in Part I for all time that loading and discharging and used laytime as elsewhere herein provided exceeds the allowed laytime elsewhere herein specified. If, however, demurrage shall be incurred at ports of loading and/or discharge by reason of fire, explosion, storm or by a strike, lockout, stoppage or restraint of labor or by breakdown of machinery or equipment in or about the plant of the Charterer, supplier, shipper or consignee of the cargo, the rate of demurrage shall be reduced one-half of the amount stated in Part I per running hour or pro rata for part thereof for demurrage so incurred. The Charterer shall not be liable for any demurrage for delay caused by strike, lockout, stoppage or restraint of labor for Master, officers and crew of the Vessel or tugboat or pilots.

9.   SAFE BERTHING - SHIFTING. The vessel shall load and discharge at any safe place or wharf, or alongside vessels or lighters reachable on her arrival, which shall be designated and procured by the Charterer, provided the Vessel can proceed thereto, lie at, and depart therefrom always safely afloat, any lighterage being at the expense, risk and peril of the Charterer. The Charterer shall have the right of shifting the Vessel at ports of loading and/or discharge from one safe berth to another on payment of all towage and pilotage shifting to next berth, charges for running lines on arrival and leaving that berth, additional agency charges and expense, customs overtime and fees, and any other extra port charges or port expenses incurred by reason of using more than one berth. Time consumed on account of shifting shall count as used laytime except as otherwise provided in Clause 15.

10.   PUMPING IN AND OUT. The cargo shall be pumped into the Vessel at the expense, risk and peril of the Charterer, and pumped out of the Vessel at the expense of the Vessel, but at the risk and peril of the Charterer only so far as the Vessel's permanent hose connections, where delivery of the cargo shall be taken by the Charterer or its consignee. If required by the Charterer, Vessel after discharging is to clear shore pipe lines of cargo by pumping water through lines and time consumed for this purpose shall apply against allowed laytime. The Vessel shall supply her pumps and the necessary power for discharging in all ports, as well as necessary hands. However, should the Vessel be prevented from supplying such power by reason of regulations prohibiting fires on board, the Charterer or consignee shall supply, at its expense, all power necessary for discharging as well as loading, but the Owner shall pay for power supplied to the Vessel for other purposes. If cargo is heated from lighters, the Vessel shall furnish steam at Charterer's expense for pumping cargo into its Vessel, if requested by the Charterer, providing the Vessel has facilities for generating steam and is permitted to have fires on board. All overtime of officers and crew incurred in loading and/or discharging shall be for account of the Vessel.

11.   HOSES: MOORING AT SEA TERMINALS. Hoses for loading and discharging shall be furnished by the Charterer and shall be connected and disconnected. *If vessel is delayed by more than 3 hours awaiting documents, laytime or demurrage, if vessel is on demurrage, shall count until documents are onboard* when Vessel loads or discharges at a sea terminal, the Vessel shall be properly equipped at Owner's expense for loading or discharging at such place, including suitable ground tackle, mooring lines and equipment for handling submarine hoses.

12.   DUES - TAXES - WHARFAGE. The Charterer shall pay all taxes, dues and other charges on the cargo, including but not limited to Customs overtime on the cargo, Venezuelan Habilitation Tax, C.I.M. Taxes at Le Havre and Portuguese Imposto de Consumo Maritimo. The Charterer shall also pay all taxes on freight at loading or discharging ports and any wharfage taxes, assessments and governmental charges which are not presently in effect but which may be imposed in the future on the Vessel or freight. The Owner shall pay all dues and other charges on the Vessel (whether or not such dues or charges are assessed on the basis of quantity of cargo), including but not limited to French droits de quai and Spanish derecha taxes. The Vessel shall be free of charge for the use of any wharf, dock, place or mooring facility arranged by the Charterer for the purpose of loading or discharging cargo; however, the Owner shall be responsible for charges for such berth when used solely for Vessel's purposes, such as awaiting Owner's orders, tank cleaning, repairs, etc. before, during or after loading or discharging.

13.   (a).   CARGOES EXCLUDED VAPOR PRESSURE. Cargo shall not be loaded which has a vapor pressure at one hundred degrees Fahrenheit (100 deg. F.) in excess of thirteen and one-half pounds (13.5 lbs.) as determined by the current A.S.T.M. Method (Reid) D-323.
   (b)   FLASH POINT. Cargo having a flash point under one hundred and fifteen degrees Fahrenheit (115 deg F.) (closed cup) A.S.T.M. Method D-56 shall not be loaded from lighters but this clause shall not restrict the Charterer from loading or topping off Crude Oil from vessels or barges inside or outside the bar at its next port or place where bar conditions exist.

14.   (a).   ICE. In case port of loading or discharge should be inaccessible owing to ice, the Vessel could lie there but on would where there are facilities for the loading or reception of the cargo in bulk. The whole of the time occupied from the time the Vessel is diverted by reason of the ice until her arrival at an ice-free port of loading or discharge, as the case may be, shall be paid for by the Charterer at the demurrage rate stipulated in Part I.
   (b)   If on account of ice the Master considers it dangerous to enter or remain at any loading or discharging place for fear of the Vessel being frozen in or damaged, the Master shall communicate by telegraph or radio, if available, with the Charterer, shipper or consignee of the cargo, who shall telegraph or radio him in reply, giving orders to proceed to another port as per...

# 1ST ORIGINAL

Clause 14 (x) where there is no danger of ice and where there are the necessary facilities for the loading or inception of the cargo in bulk, or to permit at the original port at their risk, and in either case Charterers to pay for the time that the Vessel may be delayed, at the demurrage rate stipulated in Part I.

15.    TWO OR MORE PORTS COUNTING AS ONE. To the extent that the freight rate standard of reference specified in Part I F hereof provides for special groupings or combinations of ports or terminals, any two or more ports or terminals within each such grouping or combination shall count as one port for purposes of calculating freight and demurrage only, subject to the following conditions:

(a)    Charterer shall pay freight at the highest rate payable under Part I F hereof for a voyage between the loading and discharge ports used by Charterer.

(b)    All charges normally incurred by reason of using more than one berth shall be for Charterer's account as provided in Clause 9 hereof.

(c)    Time consumed shifting between the ports or terminals within the particular grouping or combination shall not count as used laytime.

(d)    Time consumed shifting between berths within one of the ports or terminals of the particular grouping or combination shall count as used laytime.

(e)    Time consumed shifting between berths within one of the ports or terminals of the particular grouping or combination shall count as used laytime.

16.    GENERAL CARGO. The Charterer shall not be permitted to ship any packaged goods or non-liquid bulk cargo of any description; the cargo the Vessel is to load under this Charter is to consist only of liquid bulk cargo as specified in Clause I.

17.    (a)    QUARANTINE. Should the Charterer send the Vessel to any port or place where a quarantine exists, any delay thereby caused to the Vessel shall count as used laytime; but should the quarantine not be declared until the Vessel is on passage to such port, the Charterer shall not be liable for any resulting delay.

(b)    FUMIGATION. If the Vessel, prior to or after entering upon this Charter, has docked or docks at any wharf which is not ice-free or stagnant-free, she shall, before proceeding to a rat-free or stagnant-free wharf, be fumigated by the Owner at his expense, except that if the Charterer ordered the Vessel to an infected wharf the Charterer shall bear the expense of fumigation.

18.    CLEANING. The Owner shall clean the tanks, pipes and pumps of the Vessel to the satisfaction of the Charterer's an independent Inspector. The Vessel shall not be responsible for any admixture if more than one quality of oil is shipped, nor for leakage, contamination or deterioration in quality of the cargo unless the admixture, leakage, contamination or deterioration results from (a) unseaworthiness existing at the time of loading or at the inception of the voyage which was discoverable by the exercise of due diligence, or (b) error or fault of the servants of the Owner in the loading, care or discharge of the cargo.

19.    GENERAL EXCEPTIONS CLAUSE. The Vessel, her Master and Owner shall not, unless otherwise in this Charter expressly provided, be responsible for any loss or damage, or delay or failure in performing hereunder, arising or resulting from:—any act, neglect, default or barratry of the Master, pilots, mariners or other servants of the Owner in the navigation or management of the Vessel; fire, unless caused by the personal design or neglect of the Owner; collision, stranding or peril, danger or accident of the sea or other navigable waters; saving or attempting to save life or property; wastage in weight or bulk, or any other loss or damage arising from inherent defect, quality or vice of the cargo; any act or omission of the Charterer or Owner, shipper or consignee of the cargo, their agents or representatives; insufficiency of packing; insufficiency or inadequacy of marks; explosion, bursting of boilers, breakage of shafts, or any latent defect in hull, equipment or machinery; unseaworthiness of the Vessel unless caused by want of due diligence on the part of the Owner to make the Vessel seaworthy or to have her properly manned, equipped and supplied; or from any other cause whatsoever kind arising without the actual fault or privity of the Owner. And neither the Vessel nor Master or owner, nor the Charterer, shall, unless otherwise in this Charter expressly provided, be responsible for any loss of damage or delay or failure in performing hereunder, arising or resulting from:— Act of God; act of war; perils of the seas; act of public enemies, pirates or assailing thieves; arrest or restraint of princes, rulers or people; or seizure under legal process provided bond is promptly furnished to release the Vessel or cargo; strikes or lockout or stoppage or restraint of labor from whatever cause, other partial or general; or riot or civil commotion.

20.    ISSUANCE AND TERMS OF BILLS OF LADING.

(a)    The Master shall, upon request, sign Bills of Lading in the form appearing below for all cargo shipped but without prejudice to the rights of the Owner and Charterer under the terms of this Charter. The Master shall not be required to sign Bills of Lading for any port which, the Vessel cannot enter, remain at and leave in safety and always afloat nor for any blockaded port or for any port which the Master or Owners in his or their discretion consider dangerous or impossible to enter reach or leave as set forth or specified in this Charter. The Master shall not be required to sign Bills of Lading issued for the cargo shall be subject to the statutory provisions and other terms set forth or specified in sub-paragraphs (i) through (vii) of this clause and such terms shall be incorporated verbatim or be deemed incorporated by the reference in any such Bill of Lading. In such sub-paragraphs and in any Act referred to therein, the word "carrier" shall include the Owner and the Chartered Owner of the Vessel.

(i)    CLAUSE PARAMOUNT. This Bill of Lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April 16, 1936, except that if this Bill of Lading is issued at a place where any other Act, ordinance or legislation gives statutory effect to the International Convention for the Unification of Certain Rules relating to Bills of Lading at Brussels, August 1924, then this Bill of Lading shall have effect, subject to the provisions of such Act, ordinance or legislation. The applicable Act, ordinance or legislation (hereinafter called the "Act") shall be deemed to be incorporated herein and nothing herein contained shall be deemed a surrender by the Owner of any of its rights or immunities or an increase of any of its responsibilities or liabilities under the Act. If any term of this Bill of Lading be repugnant to the Act to any extent, such term shall be void to that extent but no further.

(ii)    JASON CLAUSE. In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Owner is not responsible, by statute, contract or otherwise, the cargo shippers, consignees or owners of the cargo shall contribute with the Owner in General Average to the payment of any sacrifices, losses or expenses of a General Average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo. If a salving ship is owned or operated by the Owner, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the Owner or his agents may deem sufficient to cover the estimated contribution of the cargo and any salvage and special charges thereon shall, if required, be made by the cargo, shippers, consignees or owners of the cargo to the carrier before delivery.

(iii)    GENERAL AVERAGE. General Average shall be adjusted, stated and settled according to York/Antwerp Rules 1950 and, as to matters not provided for by those rules, according to the laws and usages at the port of New York or at the port of London, whichever place is specified in Part I of this Charter. If no General Average statement is required, it shall be prepared at such port or place in the United States or United Kingdom, whichever country is specified in Part I of this Charter, as may be selected by the Owner, unless otherwise mutually agreed, by an Adjuster appointed by the Owner and approved by the Charterer. Such Adjuster shall attend to the settlement and the collection of the General Average, subject to customary charges. General Average Agreements and/or security shall be furnished by Owner and/or Charterer, and/or Owner and/or Consignees of cargo, if requested. Any cash deposit being made as security to pay General Average and/or salvage shall be remitted to the Average Adjuster and shall be held by him at his risk in a special account in a duly authorized and licensed bank at the place where the General Average statement is prepared.

(iv)    BOTH TO BLAME. If the Vessel comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, mariner, pilot or the servants of the Owner in the navigation or in the management of the Vessel, the owners of the cargo carried hereunder shall indemnify the Owner against all loss or liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said cargo, paid or payable by the other or non-carrying ship or her owners to the owners of said cargo and set-off, recouped or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying ship or Owner. The foregoing provisions shall also apply where the owners, operators or those in charge of any ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect of a collision or contact.

(v)    LIMITATION OF LIABILITY. Any provision of this Charter to the contrary notwithstanding, the Owner shall have the benefit of all limitations of, and exemptions from, liability accorded to the owner or chartered owner of vessels by any statute or rule of law for the time being in force.

(vi)    WAR RISKS.    (a)    If any part of loading or of discharge named in this Charter Party or to which the Vessel may properly be ordered pursuant to the terms of the Bills of Lading be blockaded, or

(b)    If owing to any war, hostilities, warlike operations, civil war, civil commotions, revolutions or the operation of international law (a) entry to any such port of loading or of discharge or the loading or discharge of cargo at any such port be considered by the Master or Owners in his or their discretion dangerous or prohibited or (b) it be considered by the Master or Owners in his or their discretion dangerous or impossible for the Vessel to reach any such port of loading or discharge—the Charterers shall have the right to order the cargo or such part of it as may be affected to be loaded or discharged at any other such port of loading or of discharge within the range of loading or discharging ports respectively established under the provisions of the Charter Party (provided such other port is not blockaded at that entry thereto or loading or discharge of cargo thereat is not in the Master's or Owner's discretion dangerous or prohibited). If in respect of a port of discharge no orders be received from the Charterers within 48 hours after they of their agents have received from the Owners a request for the nomination of a substitute port, the Owners shall then be at liberty to discharge the cargo at any such port which they or the Master may in their or his discretion decide on (whether within the range of discharging ports established under the provisions of the Charter Party or not) and such discharge shall be deemed to be due fulfillment of the contract or contracts of affreightment so far as cargo so discharged is concerned. In the event of the cargo being loaded or discharged at any such other port within the respective range of loading or discharging ports established under the provisions of the Charter Party, the Charter Party shall be read in respect of freight and all other conditions whatsoever as if the voyage performed were that originally designated. In the event, however, that the Vessel discharges the cargo at a port outside the range of discharging ports established under the provisions of the Charter Party, freight shall be paid as for the voyage originally designated and all extra expenses involved in reaching the actual port of discharge and/or discharging the cargo thereat shall be paid by the Charterers or Cargo Owners. In the latter event the Owners shall have a lien on the cargo for all such extra expenses.

(c)    The Vessel shall have liberty to comply with any directions or recommendations as to departure, arrival, routes, ports of call, stoppages, destinations, zones, waters, delivery or in any otherwise whatsoever given by the government of the nation under whose flag the Vessel sails or any other government or local authority including any de facto government or local authority or by any person or body acting or purporting to act as or with the authority of any such government or authority or by any committee or person having under the terms of the war risks insurance on the vessel the right to give any such directions or recommendations. If by reason of or in compliance with any such directions or recommendations, anything is done or is not done such shall not be deemed a deviation.

If by reason of or in compliance with any such direction or recommendation the Vessel does not proceed to the port or ports of discharge originally designated or to which she may have been ordered pursuant to the terms of the Bills of Lading, the Vessel may proceed to any safe port of discharge which the Master or Owners in his or their discretion may decide on and there discharge the cargo. Such discharge shall be deemed to be due fulfillment of the contract or contracts of affreightment and the Owners shall be entitled to freight as if discharge has been effected at the port or ports originally designated or to which the vessel may have been ordered pursuant to the terms of the Bills of Lading. All extra expenses involved in reaching and discharging the cargo at any such other port of discharge shall be paid by the Charterers and/or Cargo Owners and the Owners shall have a lien on the cargo for freight and all such expenses.

(vii)    DEVIATION CLAUSE. The Vessel shall have liberty to call at any ports in any order, to sail with or without pilots, to tow or to be towed, to go to the assistance of vessels in

## 1ST ORIGINAL

distress, to deviate for the purpose of saving life or property or of landing any ill or injured person on board, and to call for fuel at any port or ports in or out of the regular course of the voyage.

Any salvage shall be for the sole benefit of the Owner.

21.   LIEN. The Owner shall have an absolute lien on the cargo for all freight, deadfreight, demurrage and costs, including attorney fees, of recovering the same, which lien shall continue after delivery of the cargo into the possession of the Charterer, or of the holders of any Bills of Lading covering the same or of any stowage rent.

22.   AGENTS. The Owner shall appoint Vessel's agents at all ports.

23.   BREACH. Damages for breach of this Charter shall include all provable damages, and all costs of suit and attorney fees incurred in any action hereunder.

24.   ARBITRATION. Any and all differences and disputes of whatsoever nature arising out of this Charter shall be put to arbitration in the City of New York or in the City of London whichever place is specified in Part I of this charter pursuant to the laws relating to arbitration there in force, before a board of three persons, consisting of one arbitrator to be appointed by the Owner, one by the Charterer, and one by the two so chosen. The decision of any two of the three on any point or points shall be final. Either party hereto may call for such arbitration by service upon any officer of the other, wherever he may be found, of a written notice specifying the name and address of the arbitrator chosen by the first moving party and a brief description of the disputes or differences which such party desires to put to arbitration. If the other party shall not, by notice served upon an officer of the first moving party within twenty days of the service of such first notice, appoint its arbitrator to arbitrate the dispute or differences specified, then the first moving party shall have the right without further notice to appoint a second arbitrator, who shall be a disinterested person with precisely the same force and effect as if said second arbitrator has been appointed by the other party. In the event that the two arbitrators fail to appoint a third arbitrator within twenty days of the appointment of the second arbitrator, either arbitrator may apply to a Judge of any court of maritime jurisdiction in the city abovementioned for the appointment of a third arbitrator, and the appointment of such arbitrator by such Judge on such application shall have precisely the same force and effect as if such arbitrator had been appointed by the two arbitrators. Until such time as the arbitrators finally close the hearings either party shall have the right by written notice served on the arbitrators and on an officer of the other party to specify further disputes or differences under this Charter for hearing and determination. Awards made in pursuance to this clause may include costs, including a reasonable allowance for attorney's fees, and judgement may be entered upon any award made hereunder in any Court having jurisdiction in the premises.

25.   SUBLET. Charterer shall have the right to sublet the Vessel. However, Charterer shall always remain responsible for the fulfillment of this Charter in all its terms and conditions.

26.   OIL POLLUTION CLAUSE. Owner agrees to participate in Charterer's program covering oil pollution avoidance. Such program prohibits discharge overboard of all oily water, oily ballast or oil in any form of a persistent nature, except under extreme circumstances whereby the safety of the vessel, cargo or life at sea would be imperiled. On notice being given to the Owner that Oil Pollution Avoidance controls are required, the Owner will instruct the Master to retain on board the vessel all oily residue from consolidated tank washings, dirty ballast, etc., in one compartment, after separation of all possible water has taken place. All water separated to be discharged overboard.

If the Charterer requires that demohibitors shall be used for the separation of oil/water, such demohibitors shall be obtained by the Owner and paid for by Charterer.

The oil residues will be pumped ashore at the loading or discharging terminal, either as segregated oil, dirty ballast or co-mingled with cargo as it is possible for Charterer to arrange. If it is necessary to retain the residue on board co-mingled with or segregated from the cargo to be loaded, Charterers shall pay for any deadfreight so incurred.

The Charterer agrees to pay freight as per the terms of the Charter Party on any consolidated tank washings, dirty ballast, etc., retained on board under Charterer's instructions during the loaded portion of the voyage up to a maximum of 1% of the total deadweight of the vessel that could be legally carried for such voyage. Any extra expenses incurred by the vessel at loading or discharging port in pumping ashore oil residues shall be for Charterer's account, and extra time, if any, consumed for this operation shall count as used laytime.

## BILL OF LADING

Shipped in apparent good order and condition by                                             Steamship/Motorship

on board the                                                                                       is Master, at the port of

whereof

to be delivered at the port of

or so near thereto as the Vessel can safely get, always afloat, unto

or order on payment of freight at the rate of

This shipment is carried under and pursuant to the terms of the contract/charter dated New York/London

between                                                    and                                                    , as Charterer, and

all the terms whatsoever of the said contract/charter except the rate and payment of freight specified therein apply to and govern the rights of the parties concerned in this shipment.

Bills of Lading

In witness whereof the Master has signed

of this tenor and date, one of which being accomplished, the others will be void.

Dated at                                                                       this                         day of

Master

This Charter Party is a computer generated copy of the ASBATANKVOY form, printed under licence from the Association of Ship Brokers & Agents (U.S.A.), Inc., using software which is the copyright of Strategic Software Limited.

It is a precise copy of the original document which can be modified, amended or added to only by striking out of original characters, or the insertion of new characters, such characters clearly highlighted by underlining or use of colour or use of a larger font and marked as having been made by the licensee or end user as appropriate and not by the author.

1ST ORIGINAL

INTERNATIONAL OIL OVERSEAS INC
Additional Clauses – (ASBATANKVOY)
Dated: 07.06.2003 (1 – 39)

M.T. "PELAGOS " CP DATED: 28 MAY 2003

**1) PRIVACY:**
All negotiations and every detail of this fixture are to be kept strictly private and confidential.

**2) DRUG AND ALCOHOL CLAUSE:**
Owners warrant that they have a policy on Drug and Alcohol Abuse ("Policy") applicable to the vessel which meets or exceeds the standards in the Oil Companies' International Marine Forum Guidelines for the Control of Drugs and Alcohol on Board Ship ("OCIMF Guidelines"). Owners further warrant that this Policy will remain in effect during the term of this Charter, and that Owners shall exercise due diligence to ensure that the Policy is complied with. For the purposes of the Clause and the OCIMF Guidelines, alcohol impairment shall be defined as a blood alcohol content of 40 mg/100 ml or greater; the appropriate seafarers to be tested shall be all vessel officers and the drug/alcohol testing and screening shall include random testing of the officers with a frequency to ensure that each officer is tested at least once a year.

Owners further warrant that a full declaration has been passed on to Exxon/Exxon affiliate, which as above states that vessel operates under a Drug and Alcohol Policy which meets or exceeds the OCIMF Guidelines.

**3) ETA CLAUSE:**
Master to give Charterers ETA loading port immediately on fixing and 7 days, 72/48/24/12 hours prior arrival IF TIME ALLOWS at loading and discharge ports where time permits also ETA discharge port on sailing from load port as well as any change in ETA exceeding 6 hours in all cases. All Eta notices are essential for demurrage purposes.

**4) CARGO:**
Charterers have the option of loading Crude Oil, Dirty Petroleum Products, Gasoil and Marine Diesel Oil, maximum ... grades, but where vessel loads one grade on top of another for admixing purposes same to be treated as one grade.

Owners warrant vessel is able to segregate minimum two (2) grades with double valve, line and pump segregation. Owner warrants vessel able to load/discharge two (2) grades simultaneously without contamination.

The vessel is capable of heating to and maintaining cargo at CARGO LOADED TEMP BUT MAX 135 degrees Fahrenheit prior to discharge as per Charterers instructions. Due allowance in time only is to be made for cargo heating for a voyage of less than three days. The vessel is to present at loading port(s) fit for the carriage of THE AGREED cargo.

**5) PUMPING:**
Owners warrant that the vessel can maintain at vessels manifolds a AN AVERAGE pressure of 140 100 PSI and/or that a full cargo can be discharged within twenty four (24) hours IN BOTH CASE EXCLUDING STRIPPING, provided

**1ST ORIGINAL**

M.T. "PELAGOS " CP DATED: 28 MAY 2005

shore facilities permit. Owner warrants vessel can discharge two (2) grades simultaneously.
~~In ship-to-ship transfer operations, vessel warrants to achieve a discharge rate of up to 2,500 metric tons per hour. Vessel to have on board a sufficient range of reducers to allow connection to various hose line diameters and terminal cargo manifolds.~~

## 6) SHIP TO SHIP TRANSFER OPERATIONS:
~~If required by the Charterers the vessel shall load and/or discharge full or part cargo alongside other vessel(s) in port or at a safe anchorage.~~ ALWAYS AS PER OCIMF RULES AND REGULATIONS. ~~Concurrent loading or discharging from both side for cargo with flash point over 60 degrees centigrade shall be acceptable by owners, any restriction for such will not count as laytime used.~~

Charterers are to provide suitable fenders/lines and hoses ETC AS PER OCIMF RULES AND REGULATIONS to safely effect such operations ~~and have the option to store same on board for the duration of Charter Party. Handling of such equipment on board the vessel shall be by owners' crew at Owners' cost.~~ All such equipment shall be removed from the vessel by Charterers upon completion of ~~Charter Party~~ LOADING OR DISCHARGING without delay.

Vessel's crew shall connect/disconnect cargo hoses, heave down/heave up fenders, take/throw connection lines, transfer to/transfer back cargo hoses   and any other activities required for the completion and safe conduct of the ship to ship transfer operation for their account without any exclusion.

~~Owners warrant that the vessel is equipped with minimum 10 ton derricks port and starboard amidships to handle bunker lines/cargo hoses.~~ CHARTERERS HAVE NO LIABILITY FOR HULL OR OTHER DAMAGE, IF ANY, THAT MAY OCCUR DURING SUCH OPERATIONS

All extra insurance for above ship to ship literage operations shall be for Owners' account and Charterers have no liability for hull or other damage, if any, that may occur during such operations. Owners warrant that the vessel is equipped and capable of safely carrying out all procedures as set out in the latest revised edition of the ICS/OCIMF Ship to Ship Transfer Guide.

Ship to Ship Transfer may include Charterers very large crude barge (VLCB) of about 34,500 tdw chartered to perform such operations.

## 7) SUPER CARGO:
Charterers have the option to place on board one supercargo ~~at any time~~ during LOAD OR DISCHARGE this Charter Party. Owner is to provide such supercargo with good accommodation with private bath and food at Captain's table at a cost of US$7.00 per day at Charterers' expense. Supercargo will be allowed access, to investigate, ullage and sample all cargo, slop, bunker, ~~and ballast tanks,~~ also any void spaces, ~~and access to any other parts of vessel that may relate to carriage of cargo as he may require.~~ SUPERCARGO WILL REMAIN ON BOARD ONLY DURING LOADING AND DISCHARGING OPERATIONS. He shall also have the

2

**1ST ORIGINAL**

INTERNATIONAL OIL OVERSEAS INC
Additional Clauses – (ASBATANKVOY)
Dated: 07.03.2003 (1 – 39)

M.T. "PELAGOS " CP DATED: 28 MAY 2005

right to require selected valves on bunker and cargo systems to be sealed to preclude the possibility of cargo/product/bunker migration.

8) VESSEL DESCRIPTION:
Questionnaire'88 form duly completed before placing on subjects to form an integral part of this c/p.

9) PROTECTION & INDEMNITY INSURANCE:
Owner warrants that the vessel is a member of the..NORTH OF ENGLAND... P&I Club and also a member of the ITOPF and will remain throughout the charter period. Owner warrants that vessel holds a pollution cover of US$ 500 million, and additional US$ 200 million USD $ 1 BILLION during full time of Charter Party. Owners agreed to allow Charterers to have the benefit of Owners' P&I insurance to the extent the Rules of that Association permits. Owners to be responsible for all third party claims       which fall under Owner's responsibility.

10) INSURED VALUE:
The vessel insured value is US$ .......15 MILLION TOTAL VALUE....................

11) COMMUNICATIONS:
The master is to allow Charterers supercargo the use of vessels communication equipment EXCEPT MOBILE AND SATELLITE PHONES for reasonable operational purposes without charge.

Master shall transmit to charterers, on owners account, daily noon positions giving required information regarding vessels position, distance to go, average speed, Eta next port, cargo temperature maintained and any other information requested. Vessel shall maintain twenty-four hours (24 Hrs) watch on VHF Channel 16/14.

12) TRADING HISTORY:
Owners guarantee TO THE BEST OF OWNERS KNOWLEDGE that the vessel is not boycotted by the Arab League and has never traded to Israel.

13) AGENCY:
Owners to appoint Charterers recommended agents at load and discharge ports PROVIED COMPETITIVE.

14) ACCESS:
The Master shall not allow any vessel or craft, other than those of port authorities or pilots, to secure alongside without the express authority of Charterers.

15) OVER AGE INSURANCE:
Any additional insurance payable on vessel and/or cargo due to vessel's age or class shall be for Owners' account.

16) QUANTITATIVE RESPONSIBILITY:
Although Charterers' surveyor may be monitoring any transfer operation, this does not relieve Master or Owners of responsibility for verifying the quantity involved in

3

**1ST ORIGINAL**

INTERNATIONAL OIL OVERSEAS INC
Additional Clauses – (ASBATANKVOY)
Dated: 07.08.2003 (1 – 39)

M.T. "PELAGOS " CP DATED: 28 MAY 2005

each oil movement nor for liability under the terms of this charter party for any oil losses.

## 17) BERTH OCCUPANCY:

Owners warrant vessel shall vacate the berth after completion of ballasting or within one and a half hours following completion of loading/discharging whichever is sooner. If ship not able to vacate berth after such time due to reasons attributed to ship, any extra berth occupancy charges by terminal and port shall be for owners account, all time lost for such occupancy shall not count as used laytime. HOWEVER IF VSL IS WAITING FOR CARGO DOCUMENTS THEN SUCH TIME AND EXTRA COSTS AS ABOVE TO BE FOR CHARTERER'S ACCOUNT.

## 18) CHARTER SIGNATURE:

Owners acknowledge Charterers' payment procedures require one original signed BY OWNERS OR THEIR AGENTS Charter Party.

## 19) INTRANSIT LOSS:

In addition to other guarantees herein provided with respect to the quality and quantity of vessel's cargo, Owners shall be accountable for product losses, all volumes corrected to 60 degrees Fahrenheit and TOTAL CALCULATED VOLUMES assessed by an independent cargo inspector, in excess of the following:

0.4 0.3 percent for non-volatile products (Fuel Oil and crude Oil), 0.2 percent for gas oil motor oil gasoline, jet fuel and naphtha.

## 20) BLENDING:

OWNERS NOT TO BE RESPONSIBLE FOR THE FINAL PRODUCT WHATSOEVER. CHRTS WILL PROVIDE OWNERS AS PER OWNERS P&I CLUB WORDING, LOI WORDING AGAINST BLENDING AND/OR COMMINGELING WITHOUT BANK GUARANTEE. Charterers have the right to load on top of any cargo previously loaded by them, load into a tank containing an on board quantity at bottom, comingle cargo, and blend cargo on board by intertank cargo transfer.

## 21) DEMURRAGE TIME BAR:

Owners agree that Charterers shall be released from all liability for payment of demurrage, unless a telex invoice is received within 30 days upon completion of discharge thereby followed by the claim to be IS submitted to Charterers in writing with fully certified original supporting documents, such shall include but not be limited to original signed notice of readiness submitted and accepted and duly signed time sheets and statement of facts duly counter signed IF POSSIBLE by shippers and receivers respectively and original pumping logs duly counter signed by terminal representatives IF POSSIBLE within 60 90 days of completion of discharge.

## 22) ADHERENCE TO VOYAGE INSTRUCTIONS:

In the event of Owners/master failing to comply fully with the voyage instructions of Charterers or any other subsequent instructions relayed by charterers, Owners

4

**1ST ORIGINAL**

INTERNATIONAL OIL OVERSEAS INC
Additional Clauses – (ASBATANKVOY)
Dated: 07.08.2003 (1 – 39)

M.T. "PELAGOS " CP DATED: 28 MAY 2005

~~shall be responsible for such failure and shall indemnify Charterers for any loss of time, costs and expenses directly suffered by Charterers arising therefrom and in particular due to underlift or overlift of cargo, whether or not owners are entitled to claim deadfreight.~~ OWNERS/MASTER WILL COMPLY WITH CHRTS VOYAGE INSTRUCTIONS PROVIDED IN ACCORDANCE WITH THIS C/P EXCEPT WHERE SAFETY OF LIFE, THE VESSEL OR CARGO IS AT RISK.

**23) YORK/ANTWERP RULES:**
York/Antwerp Rules; 1974, as amended 1990, apply to this charter party.

**24) AVERAGE/ARBITRATION:**
General Average and Arbitration shall take place in London and English Law applies to this charter party.

**25) BILLS OF LADING:**
In the event of a change in discharge port AND/ OR CONSIGNEE named in Bills of Lading or if the DULY ENDORSED ORIGINAL Bills of Lading are not available at discharge port(s), the cargo is to be released by Owners against a Letter of Indemnity signed by an authorized signatory of Charterers in Owners' P&I Club wording without bank guarantee or counter signature.

**26) ROB'S:**
In the event that any cargo remains on board upon completion of discharge, Charterers shall have the right to ~~deduct from freight~~ CLAIM an amount equal to the FOB port of loading value of such cargo plus freight due with respect thereto PROVIDED THE VOLUME OF CARGO REMAINING ON BOARD IS PUMPABLE, LIQUID AND REACHABLE BY VESSEL'S MEANS AS DETERMINED BY AN INDEPENDENT SURVEYOR.

**27) WAR RISKS:**
~~Any increase of hull and machinery war risk premia over and above those in effect on the date of this Charter Party will be for Charterers account, except for the first seven days, which shall be for Owners account. Any premia or increases thereto attributable to closure (i.e. blocking and trapping) insurance shall be for Owners account.~~

~~Surcharges which are in effect on the date of this Charter Party are for Owners account.~~

BP WAR RISK INSURANCE CLAUSE (AMENDED) –
OWNERS SHALL EFFECT WAR RISKS INSURANCE IN RESPECT OF THE HULL AND MACHINERY OF THE VESSEL AND THEIR OTHER INTERESTS (INCL BUT NOT LIMITED TO, LOSS OF EARNINGS AND DETENTION AND THEIR PROTECTION AND INDEMNITY RISKS), AND THE BASIC PREMIUMS AND/OR CALLS THEREFORE SHALL BE FOR OWNERSACCOUNT. WAR RISKS INSURANCE ADDITIONAL PREMIUMS IF ANY ARE FOR CHARTERERS ACCOUNT, NET OF ALL DISCOUNTS OR REBATES RECEIVED BY OWNERS, AND PROVIDED ALWAYS THAT CHARTERERS ARE GIVEN AN INDICATION OF THE EXPECTED AMOUNT OF ADDITIONAL PREMIUM AS SOON AS

5

1ST ORIGINAL

M.T. "PELAGOS " CP DATED: 28 MAY 2005

INTERNATIONAL OIL OVERSEAS INC
Additional Clauses – (ASBATANKVOY)
Dated: 07.08.2003 (1 – 39)

POSSIBLE AFTER RECEIPT OF CHARTERERS VOYAGE ORDERS. THE
BENEFIT OF DISCOUNTS OR REBATES ON ADDITIONAL PREMIUM
RECEIVED BY OWNERS FROM THEIR WAR RISKS INSURERS,
UNDERWRITERS OR BROKERS SHALL BE CREDITED TO CHARTERERS
IN FULL. CHARTERERS SHALL REIMBURSE OWNERS ANY AMOUNTS DUE
UNDER THIS CLAUSE UPON RECEIPT OF OWNERS' INVOICE TOGETHER
WITH REASONABLE SUPPORTING DOCUMENTATION INCLUDING ALL
ASSOCIATED DEBIT AND CREDIT NOTES (IFANY). FOR THE AVOIDANCE OF
DOUBT ANY 'BLOCKING AND TRAPPING', 'LOSS OF PROFIT', 'LOSS OF
HIRE', 'LOSS OF       FREIGHT' OR 'LOSS OF BUNKERS' INSURANCE TAKE
OUT BY OWNERS IN RESPECT OF THE VESSEL, AND ANY ADDITIONAL
PREMIUM RELATING THERETO ARISING FROM CHARTERERS TRADING OF
THE VESSEL SHALL    BE FOR OWNERS' ACCOUNT. CREW WAR BONUS TO
BE FOR OWNERS ACCOUNT.

28) ITOPF:
Owners/Operators to be a member of ITOPF and shall present C.L.C. Certificate
covering the entire Charter Party period. This is required before payment is made
by Charterers.

29) PRORATION:
~~Laytime and waiting time if any at load/discharge ports to be prorated amongst
charterers/receivers according to respective cargo quantity.~~

30) NAMING LOAD AND DISCHARGE PORTS
~~Clause 4 of Asbatankvoy c/p to be replaced with this clause. Notwithstanding
anything to the contrary in this charter party and notwithstanding what loading
and/or discharging ports/ranges may have been nominated and bills of lading
issued, charterer shall have the right to change its nomination of the loading and/or
discharging ports/ranges. Any extra time and expense incurred by owner in
complying with charterer's orders shall be for charterer's account. Freight is based
on the voyage actually performed. Charterer shall have the right to make as many
changes as it deems necessary.~~

31) POSITION AND BALLAST SPEED:
~~Owners warrant that the vessel's position at the time of fixture is ........... and
vessel's ballast speed will be ...... Knots with an expected Eta basis ......... as ......~~

"OWNERS WARRANT THAT THE VSL'S POSITION AT THE TIME OF FIXTURE
IS SINGAPORE AND VSL'S BALLAST SPEED WILL BE ABOUT 14 KNOTS
WITH AN EXPECTED ETA BASIS FUJAIRAH 5-6/6/05 A.G.W.

32) SPEED:
~~Vessel will perform the laden voyage at ...... knots upto we 5, weather and safe
navigation permitting.~~VESSEL WILL PERFORM LADEN PASSAGE AT 14.0
KNOTS WSNP

6

**1ST ORIGINAL**

INTERNATIONAL OIL OVERSEAS INC
Additional Clauses - (ASBATANKVOY)
Dated: 07.06.2003 (1 – 39)

M.T. "PELAGOS " CP DATED: 28 MAY 2005

**33) BALLASTING/SHIFTING:**
Deballasting **UNLESS CONCURRENT WITH CARGO OPERATIONS** and time proceeding to **FIRST** berth shall not count as used laytime or time on demurrage, even if vessel on demurrage.

**34) DOCUMENTATION:**
Owners warrant and undertake that all loading documents shall be strictly private and confidential and shall not be handed over to any party other than charterer or charterers agent/representative **OR PORT AUTHORITIES**, only if instructed by charterers. Such confidentiality shall include copies and/or quotes of such documents to any party other than charterers.

Owners undertake to instruct master to strictly adhere to above and not to release any information under whatsoever circumstances neither in writing or in verbal unless agreed/instructed in writing by the charterers.

35)    Charterers' shall have the right to ask owners to reissue new Bill of Lading, as per requirements of charterers, upon delivery of **ALL OF** the signed B/L's to the owner/owners agent **A REPRESENTATIVE APPOINTED BY OWNERS** or master. Owners shall comply with such request **PROVIDED THE CONTENTS OF NEW BILLS OF LADINGS ARE CORRECT.**

~~36)    In case the vessel calling port Sudan master of vessel should obtain signature and stamp of receivers and agents/all concerned on following documents prior calling from port Sudan.- NOR, ullage report before discharge, ship ullage report after discharge, dry tank certificate, time sheet and LOP if any.~~

37)    Owners warrant that, a Safety Management System (SMS) in accordance with the ISM code is in operation both on shore and on board the vessels. Onwers further warrant that during the entire duration of c/p, owner (or the company as defined by the ISM code) shall have a vaild document of compliance and the vessels shall have a safety management certificate, copies of which will be supplied to charterers **ON THEIR REQUEST.**

38)    This charter party shall be treated as an independent contract and neither party shall have the right of off-setting and/or claim any amounts due or not due from any other charter parties or dealings of whatsoever nature, whether or not same may be due or justified.

The owner warrants that the master and vessel will fully comply with c/p and will not lien cargo or delay or suspend operations due to any claim arising out of **PREVIOUS** c/p's/contracts between owner and charterers and/or any charterers affiliates and/or any of charterers subsidiary companies.

**39) DISCHARGE / RELOAD CLAUSE:**
Charterers may order the vessel to discharge and/or back load a part or full cargo at any nominated port within the loading/discharging ranges specified within part 1 and within the rotation of the ports previously nominated, provided that any cargo loaded is of the description specified in part 1 and the Master in his reasonable

7

**1ST ORIGINAL**

INTERNATIONAL OIL OVERSEAS INC
Additional Clauses -- (ASBATANKVOY)
Dated: 07.08.2003 (1 – 39)

M.T. "PELAGOS " CP DATED: 28 MAY 2005

discretion determines that the cargo can be loaded, segregated and discharged without risk of contamination by, or of any other cargo. Charterers shall pay in respect of loading, carrying and discharging such cargo as follows:

a) All time used including deviation if any to be for charterers account. Deviation and other port and anchorage time used at demurrage rate plus all bunkers FO and MDO consumed irrespective of vessel being idle or steaming, plus port cost.

b) Any additional expenses, including port charges and all bunkers FO and MDO consumed, incurred.

c) If the vessel is fixed on a world scale rate in part 1 then freight shall always be paid for the whole voyage at the rate(s) specified in part 1 on the largest cargo quantity carried on any ocean leg.

INTERNATIONAL OIL OVERSEAS INC
Additional Clauses – (ASBATANKVOY)
Dated: 07.08.2003 (1 – 39)

**1ST ORIGINAL**
M.T. "PELAGOS " CP DATED: 28 MAY 2005

## ADDENDUM

IF CHRTRS PERMITS VSL TO TENDER NOR AND BERTH PRIOR TO COMMENCEMENT OF LAYDAYS, ALL TIME FROM COMMENCEMENT OF LOADING UNTIL COMMENCEMENT OF LAYDAYS TO BE CREDITED TO CHRTRS AGAINST LAYTIME AND/OR TIME ON DEMURRAGE

FOR & ON BEHALF OF
THE OWNERS

B Y    A U T H O R I T Y
MAR...ARA... ...GATION LTD.
...... ...US

AS NON - RE... ...SIBLE AGENTS ONLY

9

**EXHIBIT 3**

----------[Maria Iordanidou]----------



"Capital Shipbrokers
Operations"
<ops@capital-shipbrok
ers.co.uk>
Sent by: "Jeremy
Chamberlain"
<jchamberlain@capital-s
hipbrokers.co.uk>

05/05/2005 11:01
Please respond to
"Capital Shipbrokers
Operations"

To: <tankers.ops@marmaras-nav.gr>
cc:
Subject: DELTA SAILOR / IOOI / CP 25.04.05
Distribution List: ● 1 ○ 2

From: Capital Shipbrokers Ltd.
Outgoing Message No: 10926249/JC   05/05/05 09:01


TO: MARMARAS NAVIGATION FOR CHRISTOS

DELTA SAILOR / IOOI / CP 25.04.05
===================================

FOLL FROM CHRTS BROKERS:

QUOTE.

Ref frt remittance following from chrtrs;

qte

Date      : 05-05-2005

To        : R. S. Platou (Asia) Pte Ltd
Attn      : Capt. Abdul Waheed

From      : International Oil Overseas Inc., Jeddah

Ref       : MT Delta Sailor C/P Dtd 25-04-2005.
            Freight Remittance Detail Of USD 282,750.00
...........................................................
...
...

Ref above mentioned c/p, this is to inform the owners that charterers
have arranged remittance of freight amount of USD 282,750.00 (i.e. as
per owners freight invoice dtd 28/04) to owners nominated bank
account
being freight thru Riyad Bank, Jeddah.

B-Regard

IOOI / Ops Dept

unqte


UNQUOTE.

RGDS CAPITAL SHIPBROKERS
JEREMY CHAMBERLAIN
OFFICE TEL:          +44 (0) 207 300 8290
MOBILE TEL:          +44 (0) 776 893 0556
NEW HOME TEL:        +44 (0) 125 272 8656

This email and any attachment ("email") is confidential and contains preferred information, which may also be legally privileged or otherwise protected from disclosure and intended only for the addressee. Access to this email by anyone else is unauthorised. If you are not the intended recipient, please notify the sender by return and delete this email from your system. Any disclosure, copying, distribution or any action taken in reliance on this email is strictly prohibited and may be unlawful. Capital Shipbrokers Ltd do not warrant that any email is free from viruses and defects, do not guarantee the completeness or accuracy of the information contained in it and further disclaim and do not accept any liability for any loss, damage or expense whatsoever and howsoever caused, arising from the sending, receipt, use or reliance placed upon the information contained in the email. Any views expressed in this email may be those of the writer and do not necessarily reflect those of Capital Shipbrokers Ltd.

This e-mail has been scanned for all viruses by Star Internet. The service is powered by MessageLabs. For more information on a proactive anti-virus service working around the clock, around the globe, visit: http://www.star.net.uk

②

```
* PRINT NUMBER MLQSPFQS6431 PRINTED BY MLQ OPR K59 ON 18JUL2005 AT 12:55:16  *
*                              PRINT CLASS RX RECEIVE                         *
*                                                                            *
* IRN 126003683            SERVICE IN  SWF03     HASH 1111                    *
* SRN 06MIOLQRAAAXXXOPR1GJ  SERVICE OUT NOS48I    OSN 028163                  *
*                                                                            *
* SENDER ADDRESS           MRMDUS33                                          *
* ROUTE CODE (MNBINNY )    HSBC BANK USA NA                                   *
*                          NEW YORK                                          *
*                          UNITED STATES                                     *
******************************************************************************
* *** WARNING *** THIS PRINTOUT IS A REPRINT                                 *
* *** REMARK *** AUTHENTICATOR CORRECT                                       *
******************************************************************************
                       AS RECEIVE HEADER WITH TRANSLATED TEXT
--------------------------------------------------------------------------------
{1:FO1MTDLBRAAAXXX7260028163}
{2:O10321I3050505MRMDUS33DXXX0720978960050506041JN}
{3:{100:126009559}}
{119:STP}}

MT103 SINGLE CUSTOMER CREDIT TRANSFER
20  TRN                         11 RNY126009600
23B BANK OPERATION CODE         CRED
32A VAL DATE (CCY/AMT)
    VAL DATE                    06MAY2005
    CCY/AMT                     USD282,750.00
50K ORDERING CUSTOMER
    FULL N/A                    MARINA WORLD SHIPPING CORP
52A ORDERING BK
    SWIFT ADDRESS               CHASUS33
                                JPMORGAN CHASE BANK NA
                                NEW YORK
                                UNITED STATES

53A SENDER REIMB THRU
    SWIFT ADDRESS               MIDLGRAA
                                HSBC BANK PLC
                                PIRAEUS
                                GREECE

59  BENEF CUSTOMER
    A/C NO                      /SRO5071000100000010500550071
    FULL N/A                    ROUTE HOLDING INC.
70  REM INFO                    /RFB/SWF OF 050505
                                FRTRHT PYMT REF.370
71A DETAILS OF CHARGES          SHARE TRANSACTION CHARGES
72  SENDER TO RECEIVER INFO     INSTRUCTIONS FOLLOWING ARE FOR THE
                                'ACCOUNT WITH' BANK
                                (OBD)RIYAD BANK RIYADH 11431,
                                //SAUDI ARABIA

TRAILER
{5:
{MAC:7A7CGG00}
{CHK:12C07447145C}}            Att: Marina
PRINT NUMBER MLQSPFQS6431 PRINTED BY MLQ OPR K59 ON 18JUL2005 AT 12:55:16
>>>>>>>>> POSSIBLE DUPLICATED PRINT <<<<<<<<<
END OF MESSAGE
```